475 S.E.2d 521

STATE of West Virginia, Plaintiff
Below, Appellee,

v.

Timothy Mark McKENZIE, Defendant
Below, Appellant.

No. 22976.

Supreme Court of Appeals of
West Virginia.

Submitted Jan. 16, 1996.

Decided July 18, 1996.

Victor S. Woods, Assistant Attorney General, Charleston, for Appellee.

Harold M. Sklar, Steven R. Bratke, McNeer; Highland & McMunn, Clarksburg, for Appellant.

PER CURIAM:

The appellant, Timothy Mark McKenzie,. was tried for, and convicted of, second degree murder in the Circuit Court of Wood County,[1] Judge Jeffrey Reed presiding, for the death of Stephanie Cain. Appellant was sentenced to from five-to-eighteen years in the State penitentiary and now appeals his conviction, making fourteen assignments of twenty-one errors. After an exhaustive review, we find that no prejudicial error was committed below and affirm the conviction.

### FACTS

From the record it appears that the appellant, then seventeen, met Stephanie Cain, then fifteen, in early 1990. At the time, appellant lived with his mother in her apartment in Nutter Fort, West Virginia, while Ms. Cain resided at her grandmother's house in Stonewood, West Virginia, approximately one-half mile from the McKenzie residence.

Appellant and Ms. Cain dated for some months, and Ms. Cain became pregnant.

During the pregnancy, the couple ceased to date each other then had a brief reconciliation shortly before their daughter was born January 21, 1991. During the month following the baby's birth, the couple and their baby resided with appellant's mother in her apartment. Thereafter, the couple separated, apparently due to antagonism between appellant's mother and Ms. Cain, and Ms. Cain returned with the baby to her grandmother's house. About a month later, on March 30, 1991, appellant was injured in an automobile accident, after which the couple ceased dating.

It appears that certain members of Ms. Cain's family had a history of violent behavior and that appellant feared for his safety after the separation. Appellant also claimed that at least one member of the Cain family directly threatened appellant and that Ms. Cain exhibited violent behavior on several occasions and sometimes physically abused appellant. He also claimed that Ms. Cain emotionally abused appellant by questioning the paternity of their daughter and by threatening him with denial of visitation with the child or conditioning such visitation on appellant not having a relationship with any other female. There also was evidence that Ms. Cain neglected her daughter, that she sometimes absented herself for long periods of time without explanation and left the child in appellant's care during those periods, and that appellant took good care of his daughter at such times.

In the summer of 1992, appellant began to date Patricia Jones. Appellant claims that Ms. Cain's physical and psychological abuse escalated as a result, and Ms. Cain also began threatening Ms. Jones and her mother with physical harm. In response, aware of the reputation of Ms. Cain and members of her family for violence, the elder Ms. Jones decided to begin shopping for a gun. In December, 1992, Patricia Jones and her mother discussed the possible purchase of a .22 caliber revolver with Steve Phares, who had one for sale. Appellant was not present, and the gun was not purchased at that time.

---

1. This proceeding originated in the Circuit Court of Harrison County, West Virginia. However, due to pretrial publicity, a request for change of venue was granted by the Circuit Court of Harrison County. This Court transferred the matter to the Circuit Court of Wood County.

On December 11 and 12, 1992, appellant went hunting in Gocke Hollow, which is located about one mile from his residence. He was familiar with this area, as he had spent a portion of his youth there. At midday on December 12, appellant returned home and prepared to go to work at the Nutter Fort Dairy Queen, where he was assistant manager. He worked a full shift, during which Ms. Cain called the store to locate appellant. In successive calls, Ms. Cain was informed by appellant's co-workers either that he was not there or that he was there but did not want to talk to Ms. Cain. At the close of appellant's shift, he went home to change clothes for a Christmas party scheduled to be held at the Dairy Queen shop.

At 10:43 p.m. that evening, Ms. Cain gave the Nutter Fort Police Department a report that appellant was a missing person. A police officer located appellant at the Dairy Queen shortly before 11:00 p.m. Appellant advised the officer that he had not been missing and that he was fine but did not wish to see or speak to Ms. Cain. Ms. Jones joined appellant at the Christmas party shortly thereafter. She advised appellant that she had located a gun that might be purchased for protection. The couple left the party about twenty minutes later.

Ms. Jones told appellant that she had spoken with Steve Phares again earlier in the evening regarding the purchase of the handgun. Appellant and Ms. Jones met Phares and purchased the revolver. The two then drove to appellant's apartment. Upon arriving at the apartment, they were met by Ms. Cain, who had left her grandmother's house at about 11:30 p.m. According to appellant, Ms. Cain began screaming and pounding on Ms. Jones' car. Ms. Jones stayed in the car while appellant went into the apartment to get a change of clothes. Ms. Cain followed him into the apartment and refused to leave until they discussed matters. Appellant then went outside to the car and told Ms. Jones to come back later. Appellant and Ms. Cain argued for approximately two hours. At about 1:30 a.m. (now, December 13, 1992), while both Ms. Cain and appellant were in the apartment, Ms. Cain telephoned her grandmother and reported where she was; it

appears from the record that appellant had gone to the bathroom in the apartment when Ms. Cain made this call and may not have been aware of Ms. Cain's call.

At about 2:00 a.m., Ms. Jones returned to appellant's apartment, while Ms. Cain was still there. Appellant testified at his trial that upon hearing Ms. Jones return, Ms. Cain pulled out a knife and stated that she would "teach that f_____ bitch a lesson". Appellant had a .22 caliber bullet remaining from an old target rifle. He put the bullet in the chamber of the gun and fired, pulling the trigger on an empty chamber. He pulled the trigger again, and a single shot went off, hitting Ms. Cain in the back of the head. Appellant testified he believed Ms. Jones was in danger, but he did not intend to shoot Ms. Cain in the head. Appellant also testified Ms. Cain exhibited no signs of life after he shot her.

Ms. Jones entered the apartment and helped appellant put Ms. Cain's body in a large cardboard storage box. They taped the box shut with gray duct tape and put the box in Ms. Jones' car. Appellant instructed Ms. Jones to drive to Gocke Hollow, where, with her assistance, he pushed the box over a highwall, forty-six feet above an illegal dumping area. In a statement Ms. Jones later gave to police, Ms. Jones stated that Ms. Cain had been making noises, like she was trying to talk, while she was in the cardboard box, when the box containing her body was being put in the car, and as the box was being pushed over the highwall.

After pushing the box and body over the highwall, appellant and Ms. Jones returned to appellant's apartment. Using household cleaners, they cleaned the carpet and disposed of the soiled rags, a jacket Ms. Cain had worn when she arrived at appellant's apartment, and the knife Ms. Cain had allegedly brandished earlier. These items were never recovered.

Later that day, December 13, 1992, Ms. Cain's grandmother telephoned appellant to ask if Ms. Cain was still at his house. Appellant replied that Ms. Cain was not there and then asked if he could visit the daughter born of his association with Ms. Cain. Ms. Cain's grandmother informed him he could visit,

and appellant proceeded to visit the grandmother's residence. While there, appellant denied knowing anything about Ms. Cain's whereabouts. He stated then that, after seeing her for a few moments at 11:00 the previous evening, he told Ms. Cain that they would talk the next day. The last appellant saw of her, he said then, was when Ms. Cain was walking across a pedestrian bridge towards her grandmother's home. When appellant relayed this story, it appears he was not yet aware that Ms. Cain had telephoned her grandmother at 1:30 a.m. to tell her grandmother she was at appellant's apartment and would be home shortly.

Approximately one and one-half months later, appellant went to Gocke Hollow and discovered the box had broken open, exposing Ms. Cain's body. Appellant returned late that night or early the next morning to cover her body up by wedging her body between large boulders and covering her head and shoulders with parts of the cardboard box and dirt.

Ms. Cain was reported missing on December 26, 1992. Captain Rick Miller of the Stonewood Police Department headed the missing persons investigation. Because appellant was reported as the last person to see Ms. Cain, Captain Miller spoke with appellant several times between January 4 and January 25, 1993, asking what appellant knew regarding Ms. Cain's whereabouts. The investigation concentrated on three suspects: appellant, Ms. Jones, and Kevin Allen, appellant's best friend.

In a separate proceeding commenced at the instance of Ms. Cain's grandmother, appellant's parental rights to his child born of Ms. Cain were terminated at about this time, and the child was taken to live with Ms. Cain's mother in Virginia. On January 14, 1993, appellant retained a Clarksburg attorney, Thomas Kupec, to assist in gaining custody of his daughter.

Shortly thereafter, appellant was asked by police to submit to a polygraph examination. He agreed to do so, but, before submitting to the test, sought the advice of Attorney Kupec. Kupec advised him not to take a polygraph examination. When police, on or about January 28, 1993, came to appellant's

place of employment and pressed appellant to take the polygraph, appellant called his attorney, Mr. Kupec, who then spoke to the police by telephone and advised them that they could interview appellant in counsel's presence. For a period of weeks, the police made no further effort to contact appellant. Then they arranged with Mr. Kupec to interview appellant at Kupec's office. That interview was held on March 9, 1993, after appellant had again consulted with Mr. Kupec regarding his exposure to criminal charges.

The interview in Mr. Kupec's office was conducted by Captain Rick Miller and Deputy James Miles and was, in part, tape recorded. At the beginning of the interview, appellant signed a waiver-of-rights form presented to him by the police. One of the sentences on the form originally read, "I do not want a lawyer at this time." The sentence was modified by Attorney Kupec, who marked out the words "do not want", so that it read, "I have a lawyer at this time." During the interview, appellant maintained that he had no knowledge of Ms. Cain's whereabouts and no connection with her disappearance. At a pretrial hearing held as a part of the subsequent prosecution of appellant, Attorney Kupec testified that the tape of the March 9, 1993 interview was not complete. Kupec testified that at the conclusion of the interview, he advised the police as follows: "I want a copy of it [the tape of the interview] to be delivered to me upon receipt of it, and you folks are not to talk to this man unless you come back through my office and discuss that same with me." Kupec testified further he did not know if he had also told the officers at that time that he did not represent appellant with respect to possible criminal charges but that he had so advised the police on prior occasions. Specifically he testified as follows:

Q: During the course of that conversation, did you ever make clear to Capt. Miller what your representation was of Mr. McKenzie?

A: Well, I don't know the answer to that, to be honest with you. I listened to the tape again, and it's not anywhere in the tape. I'm sure—to answer that question fairly, I have to go back and say that prior to that time, Capt. Miller had con-

tacted me on numerous occasions, probably six to ten occasions, and I advised him that I did not represent Mark on the criminal matter, I only represented him on this civil matter . . . .

\* \* \* \* \* \*

What I didn't want to do was get drawn into defending him on any criminal matter without just compensation. I was not compensated to represent him on any criminal matter.

The police officers testified at the same pre-trial hearing. Captain Miller testified that he did not remember Mr. Kupec instructing the police officers not to speak to appellant unless the officers went through Mr. Kupec. Miller further testified, "Mr. Kupec made it clear to us that he was not representing him on any criminal matter; he was just representing him on a child custody. He was just trying to help communicate between Mark and us on the missing person's." Deputy Miles also did not remember Mr. Kupec indicating that the officers should go through Mr. Kupec if they wanted to speak further to appellant. When asked if he remembered that instruction, Deputy Miles answered:

No. The only thing that Mr. Kupec said was after we had gone off of the record and as we were about to leave. He told us that if we needed to get back in touch with Mark, just to let him know, words to that effect. It wasn't any statement that he made. It was just, in leaving, 'If there's anything else we can do for you, let us know,' something like that.

In any event, the police had no further contact with appellant until March 26, 1993. On that day, Ms. Jones went to the Shinnston Barracks of the West Virginia State Police to take a polygraph examination related to the investigation of Ms. Cain's disappearance. Appellant accompanied her to the barracks but remained outside, in the parking lot. One of the deputy sheriffs assigned to the investigation went outside the barracks and engaged appellant in conversation regarding Ms. Cain. During the conversation appellant again agreed to, and later that day did, submit to a polygraph examination. Appellant did not ask at that time to talk to Mr.

Kupec, nor did the police contact Mr. Kupec prior to administering the polygraph. Appellant claims the police advised him then that he passed the polygraph.

On March 27, 1993, after an intensive search, the bodily remains of Ms. Cain were recovered in Gocke Hollow. Dr. James Frost, Deputy Chief Medical Examiner of the West Virginia State Medical Examiner's office, supervised the recovery of the body, which was then badly decomposed. Dr. Frost conducted an autopsy on the remains. The autopsy report states, "CAUSE OF DEATH: Gunshot wound to the head" and "MANNER OF DEATH: Homicide." The report also disclosed that Ms. Cain's left sacroiliac joint was fractured.

On March 29, 1993, Kevin Allen, appellant's best friend, was questioned by the police. The police acknowledged that they questioned Allen solely by reason of his friendship with appellant and not by reason of any independent evidence of his involvement with the disappearance of Ms. Cain. He was given a polygraph examination at that time. During the interview, Allen was persuaded to telephone appellant and tell him that Ms. Cain's brother was looking for appellant, intending to beat him up, and to ask appellant if he had knowledge of Ms. Cain's whereabouts. The call was made and taped by the police, but appellant made no incriminating statements during that call.

At about 2:00 p.m. on March 30, 1993, Ms. Jones was picked up by the police for questioning. She was given a polygraph examination and confessed to her involvement in Ms. Cain's death. In her confession, Ms. Jones fully implicated appellant. She also stated that, after Ms. Cain was shot, she was making noises in an attempt to mutter something, both as she was pushed into the box and as the box was loaded in the car and dumped over the highwall.

At about 6:00 p.m. that day, appellant also was picked up by Captain Miller and Deputy Rogers, both of whom were then aware of Ms. Jones' confession that implicated appellant. He was questioned by Dallas Wolfe, a West Virginia State Trooper who specializes in the interrogation of homicide suspects.

Appellant confessed to killing Ms. Cain, giving some conflicting and varying accounts during an interrogation that lasted over two hours. Appellant gave a statement which was tape recorded and reduced to writing. Appellant then led the police to the gun used in the shooting, which he had buried. He was then presented before a magistrate for arraignment.

On March 31, 1993, the police executed a search warrant on appellant's residence and Jones' vehicle. An audio recorder and microcassette containing taped conversations between appellant and the victim were recovered from the residence. Carpet samples and carpet padding samples were also taken from the residence.

Appellant was indicted by the Harrison County Grand Jury in December, 1993. His trial took place in Wood County, West Virginia, in February, 1994. The jury convicted him of second degree murder, and he was sentenced to five-to-eighteen years in the State penitentiary. He appeals his conviction and sentence, as well as various pre-trial rulings by the circuit court.

## I.

On appeal, appellant's first claim is that the trial court committed reversible error by failing to suppress and exclude his March 30, 1993 confession and by failing to suppress and exclude the testimony of Kevin Allen. He also claims that a firearm mentioned in the confession was a "fruit of the poisonous tree" and improperly admitted into evidence by the trial court. Lastly, he claims that the State erred by failing to present him promptly to a magistrate for arraignment.

■ Appellant argues that the confession in issue was obtained in violation of his Fifth Amendment right to counsel under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), because the police failed to comply with Attorney Kupec's instruction not to question appellant out of the presence of counsel. It appears that he relies upon *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), in asserting that his manifestation of a desire to deal with police only through counsel precluded any

effective waiver of his *Miranda* right to counsel on March 30, 1993. This Court finds this argument to be meritless, since appellant's desire to deal with police through counsel was articulated outside of a custodial setting and occurred approximately three weeks before the police contact that resulted in his confession.

Recently, this Court held in *State v. Bradshaw*, 193 W.Va. 519, 457 S.E.2d 456, *cert. denied*, — U.S. —, 116 S.Ct. 196, 133 L.Ed.2d 131 (1995), that a suspect cannot anticipatorily invoke his Fifth Amendment right to counsel outside of custodial interrogation. In *Bradshaw*, a suspect who was not in custody was given *Miranda* warnings and voluntarily accompanied police to their office for purposes of an interview. After arriving at the office, the suspect was advised of his *Miranda* rights again. A waiver-of-rights form was executed, and defendant agreed to talk to the officers without the assistance of an attorney. He was again advised of his *Miranda* rights and executed a second waiver-of-rights form when police from West Virginia arrived in Ohio, where the interview was being conducted. Shortly thereafter, the suspect was placed in custody and again given *Miranda* warnings. A third waiver of rights form was executed, whereby the suspect waived his right to counsel. During the questioning the suspect confessed. This Court upheld the confession and stated:

> ... [T]he *Miranda* right to counsel has no applicability outside the context of custodial interrogation. Therefore, until the defendant was taken into custody, any effort on his part to invoke his *Miranda* rights was, legally speaking, an empty gesture. We believe the "window of opportunity" for the assertion of *Miranda* rights comes into existence only when that right is available.

193 W.Va. at 530, 457 S.E.2d at 467 (footnote omitted). Thus, this Court rejected the proposition that a suspect may anticipatorily invoke his *Miranda* rights.

In the case at bar, appellant's attempt to assert his *Miranda* right to counsel, if invoked at all, was ineffective because it was invoked weeks before the subsequent contact with police.

■ A suspect who is not in custody does not have *Miranda* rights. In *Bradshaw,* we said "[t]he 'inherent compulsion' that is brought about by the *combination* of custody and interrogation is crucial for the attachment of *Miranda* rights." 193 W.Va. at 530, 457 S.E.2d at 467. Further, even appellant concedes he was not in custody when he was questioned in Attorney Kupec's office on March 9, 1993. In fact, appellant was never taken into custody prior to confessing. Thus, the *Miranda* right to counsel had not attached when Attorney Kupec allegedly told police not to contact appellant further. Even if appellant was in custody at the March 9, 1993 questioning, the subsequent break in custody after the assertion of a right to counsel eliminates application of the *Edwards* rule. *See Dunkins v. Thigpen,* 854 F.2d 394 (11th Cir.1988), *cert. denied,* 489 U.S. 1059, 109 S.Ct. 1329, 103 L.Ed.2d 597 (1989). We have said, "[t]o the extent that any of our prior cases could be read to allow a defendant to invoke his *Miranda* rights outside the context of custodial interrogation, the decisions are no longer of precedential value." Syl. pt. 3, *State v. Bradshaw,* 193 W.Va. 519, 457 S.E.2d 456 (1995). As appellant did not assert a right to counsel during the March 30, 1993 questioning, his *Miranda* right to counsel was not violated. The trial court correctly concluded that "there simply cannot be a finding that there is a clear and unequivocal assertion of that right to counsel."

Appellant next contends that his best friend, Kevin Allen, was instructed to elicit inculpatory statements on several occasions. He claims that Allen was acting as an agent of the police and, therefore, admission of his testimony violated appellant's constitutional rights.

On March 29, 1993, Allen called appellant at the request of the police, in an unsuccessful attempt to elicit an incriminating statement. Approximately a month later, after he was arrested, appellant telephoned Allen and the two discussed appellant's life in jail. Later, Allen was pulled over for an expired inspection sticker by Deputy Miles, one of the officers who investigated Ms. Cain's disappearance. Allen was asked if he had found anything out or if he knew anything. He informed the officer he did not know anything, but would try to find out something. He was given a warning ticket, and the deputy let him go. Allen testified at the suppression hearing that the police did not promise him any benefit and that he received the warning ticket. He also testified that appellant called him from jail a second time. When Allen asked him if he really did it, appellant answered that he had.

At the conclusion of the suppression hearing regarding Allen's testimony, the court ruled that appellant's statement was admissible and found there was no relationship between Allen and the police. The State withdrew its motion to admit the statement that appellant made to Allen prior to his arrest. The court then found, in its pre-trial motions order, "that despite the said Kevin Allen's interrogation and agreement to telephone the defendant on March 30, 1993, while being tape recorded, and further agreement to speak to the defendant to elicit inculpatory statements while the defendant was in custody, such latter conversation was admissible since the defendant initiated that conversation with Kevin Allen." The court also held that, in so acting, Kevin Allen was not an agent of the State. The State's motion to admit the statements made while appellant was incarcerated was granted, and the motion regarding the March 30, 1993 statement was withdrawn.

■ Appellant bases his argument on a Sixth Amendment claim, as discussed in *United States v. Henry,* 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980), where the Court said, "[b]y intentionally creating a situation likely to induce Henry to make incriminating statements without the assistance of counsel, the Government violated Henry's Sixth Amendment right to counsel." 447 U.S. at 274, 100 S.Ct. at 2189, 65 L.Ed.2d at 125. A full reading of *Henry* shows that the Court found a Sixth Amendment violation because of three factors. "First, Nichols [the government informant] was acting under instructions as a paid informant for the Government; second, Nichols was ostensibly no more than a fellow inmate of Henry; and third, Henry was in custody and under in-

dictment at the time he was engaged in conversation by Nichols." 447 U.S. at 270, 100 S.Ct. at 2186–87, 65 L.Ed.2d at 122. In that case, there was no question regarding whether Nichols was acting as an agent of the government. He was admittedly a paid informant and had been for at least a year. The question there was whether Nichols had "deliberately elicited incriminating statements from Henry." 447 U.S. at 270, 100 S.Ct. at 2186, 65 L.Ed.2d at 122. In the case at bar, the trial court found Allen was not an agent of the State and that the latter conversation was admissible because appellant initiated that conversation. The government was not rewarding Allen for furnishing information, and some of appellant's comments were not solicited at all; appellant volunteered them. "[I]n order to find a violation of a defendant's Sixth Amendment right to counsel, a court must find that defendant's statements (1) were made to a government agent, and (2) were deliberately elicited." *United States v. Taylor*, 800 F.2d 1012, 1015 (10th Cir.1986), *cert. denied*, 484 U.S. 838, 108 S.Ct. 123, 98 L.Ed.2d 81 (1987). At trial, Allen testified that he was not working for the police, and he did not report appellant's statement until weeks after the conversation. We affirm the ruling of the trial court where it found that Allen was not an agent of the State because no agreement was made between Allen and the police and no benefits accrued to Allen for his cooperation.

Appellant also argues that the evidence of the murder weapon should have been suppressed at trial because the recovery of the weapon was derived from an unconstitutionally extracted confession and is, therefore, fruit of the poisonous tree. As we have upheld the trial judge's ruling on the admissibility of the confession, "[i]t follows that the [murder weapon] was properly admitted into evidence." *State v. Goodmon*, 170 W.Va. 123, 131, 290 S.E.2d 260, 268 (1981).

Appellant next claims that the murder weapon should not have been admitted into evidence because the officers violated the Prompt Presentment Rule enunciated in Rule 5(a) of the West Virginia Rules of Criminal Procedure[2] by escorting him to locate and identify the murder weapon, rather than presenting him before a magistrate for arraignment after he was brought to the Bridgeport State Police detachment. This argument fails because the delay in presenting appellant after his confession did not result in the recovery of any evidence that was not obtainable as a result of the confession. The directions necessary to recover the gun were included in the taped confession. Thus, the gun would have eventually been recovered, regardless of the delay in presenting appellant to a magistrate. The delay in the present case was not operative in uncovering additional inculpatory evidence. In *State v. Humphrey*, 177 W.Va. 264, 351 S.E.2d 613 (1986), this Court said, in syllabus point 1:

"'The delay in taking a defendant to a magistrate may be a critical factor [in the totality of circumstances making a confession involuntary and hence inadmissible] where it appears that the primary purpose of the delay was to obtain a confession from the defendant.' Syllabus Point 6, *State v. Persinger*, [169 W.Va. 121], 286 S.E.2d 261 (1982), as amended." Syllabus Point 1, *State v. Guthrie*, [173 W.Va. 290], 315 S.E.2d 397 (1984).

In *Humphrey*, after the suspect confessed, the State police went to a dumpster, identified by defendant, in an effort to locate articles to corroborate information provided by defendant. Nothing was found, and the police then went to the defendant's parents'

---

2. Rule 5(a) of the West Virginia Rules of Criminal Procedure states:

**Rule 5. Initial appearance before the magistrate.**

*In general.*—An officer making an arrest under a warrant issued upon a complaint or any person making an arrest without a warrant shall take the arrested person without unnecessary delay before a magistrate within the county where the arrest is made. If a person arrested without a warrant is brought before a magistrate, a complaint shall be filed forthwith which shall comply with the requirements of Rule 4(a) with respect to the showing of probable cause. When a person, arrested with or without a warrant or given a summons, appears initially before the magistrate, the magistrate shall proceed in accordance with the applicable subdivision of this rule.

home, where defendant had said they would locate the clothing he wore on the night of the shooting. During this time, defendant remained at police headquarters and was later taken before a magistrate. Defendant argued that his confession should not have been admitted because of failure to promptly present him before a magistrate. This Court held that the written statement of confession was properly admitted into evidence.

In the case at bar, the trial court found, during the pre-trial hearing, that the gun was admissible, stating:

> While there may have been a prompt presentment problem, the testimony establishes, however, that it would have been inevitably discovered because he gave the directions. And the directions were fairly close, according to the testimony, and they would have been able to find that even if taking him directly there would have been a prompt presentment violation, that the inevitable discovery rule would kick in and would allow for the admission of the gun to be admitted anyway.

In *Humphrey*, this Court found no error where the delay in presentment was occasioned by the police attempting to recover physical evidence that was previously revealed in the confession. The same scenario is repeated in the case at bar, and we find no error in the trial court's ruling which admitted into evidence the murder weapon that was found as a result of appellant's confession prior to presenting appellant to a magistrate for arraignment.

## II.

Another point which appellant assigns as error is that the trial court refused to exclude the testimony of Dr. Howard Kaufman. Dr. Kaufman testified regarding the ability of the victim to survive the gunshot wound. Appellant also claims the trial court erred in refusing to order the exhumation of the decedent for independent analysis by Dr. William Cox, appellant's forensic pathologist. We find the testimony of Dr. Kaufman was properly admitted at trial and that the determination regarding whether to exhume the body was in the trial court's discretion.

Ms. Cain's body was found on March 27, 1993. The removal of the body was directed by Dr. James L. Frost, Deputy Medical Examiner. On March 29, 1993, Dr. Frost performed the autopsy. On March 30, 1993, Patricia Jones and appellant, after giving inculpatory statements, were arrested and charged with homicide. In her confession, Ms. Jones stated the victim was making noises in an attempt to talk after she was shot. Prior to trial, the State supplemented its witness list to include Dr. Howard Kaufman, a neurosurgeon at West Virginia University Hospitals. The judge admonished the State that Dr. Kaufman could not testify to or form an opinion utilizing Patty Jones' statement regarding whether the victim was trying to talk after being shot.

At trial, Dr. Kaufman testified the wound was survivable. He testified as follows:

Q: This particular case, the wound that you saw to Stephanie Cain, do you have an opinion as to whether or not that was a survivable wound?

A: I believe it—there's good reason to believe it was survivable.

Q: When we say survivable, what do you mean by survivable?

A: If the bullets had not done much damage—I've had patients that looked like her that are back going about their business.

Q: Within what period of time?

A: Weeks or months.

Appellant complains that Dr. Kaufman's opinion on the survivability of the wound was speculative and inadmissible, based on the autopsy and a fact not in evidence, that being decedent's attempt to talk after being shot. Appellant argues there is no record evidence of the latter basis, and, therefore, under *State v. Jackson*, 171 W.Va. 329, 298 S.E.2d 866 (1982), the testimony was inadmissible.

The State argues appellant's argument is meritless because Dr. Kaufman's testimony was relevant to circumstantially determine appellant's intent when he shot Stephanie Cain; that is, whether he acted with malice in shooting Ms. Cain and pushing her over the highwall. Dr. Kaufman testified that his opinion was based on his analysis of the

forensic data obtained as a result of Dr. Frost's autopsy.

■ Appellant filed a motion to exclude Dr. Kaufman's testimony. The trial court denied the motion but, as noted above, precluded Dr. Kaufman from expressing an opinion based on Patricia Jones' statements. Dr. Kaufman testified that Ms. Cain likely would not have died instantaneously from the wound and might have survived if she had received medical treatment. Dr. Kaufman's testimony was based on the same information that was provided to Dr. Cox, appellant's expert. We find there was nothing speculative about Dr. Kaufman's testimony.

■ Dr. Kaufman's testimony was admissible under Rule 702 of the West Virginia Rules of Evidence, which states:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

The Rules of Evidence do not require an expert to rest his opinion on facts that are in evidence. Indeed, Rules 703 and 705 of the West Virginia Rules of Evidence [3] regarding expert testimony do not contain any such requirement. This Court has previously stated that "[a]ny physician qualified as an expert may give an opinion about physical and medical cause of injury or death. This opinion may be based in part on an autopsy report." Syl. pt. 5, *State v. Jackson*, 171 W.Va. 329, 298 S.E.2d 866 (1982).

■ We move now to the issue of exhumation. Appellant argues that Dr. Kaufman's participation in the case obligated defense counsel to seek exhumation to counter the potentially damning testimony that the wound was survivable. Appellant contends that even being sensitive to the concerns for the decedent's family, the demands of justice required that the body be exhumed to insure a fair trial. The State argues the trial court properly refused to order exhumation because the State medical examiner preserved the evidence necessary for appellant's expert to conduct comparable forensic analysis. We agree. Dr. Frost retained sufficient evidence to enable Dr. Cox to render an independent opinion on the survivability of the wound. The record shows that Dr. Frost went to great lengths to preserve evidence for later examination by appellant's expert. Before opening the skull, Dr. Frost made x-rays of the victim's head, providing a three-dimensional view of where the bullet fragments came to rest in the brain. Dr. Frost retained tissue samples and photographs, and removed and preserved the portion of the victim's skull where the bullet had entered. This evidence was made available to the defense for independent evaluation. Appellant was provided a reasonable opportunity to examine the evidence presented by the State's experts. *See State v. Thomas*, 187 W.Va. 686, 421 S.E.2d 227 (1992).

The record indicates no negligence or bad faith on the part of the State in preservation of evidence or in preservation of documentation and results. The State made all of its evidence, documentation, and the results of Dr. Frost's tests available to appellant for independent analysis.

■ This Court has long held:

If a court, in a murder prosecution, has power to order the body of the deceased to be disinterred, for examination for evidential purposes, it is only when to do so is

---

3. **Rule 703. Bases of opinion testimony by experts.**
 The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. (As amended by order entered June 15, 1994, effective July 1, 1994.)

**Rule 705. Disclosure of facts or data underlying expert opinion.**
 The expert may testify in terms of opinion or inference and give reasons therefor without first testifying to the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination. (As amended by order entered December 6, 1994, effective January 1, 1995.)

plainly necessary and essential to the justice and fairness of trial, and is a matter in the discretion of the court, and its refusal to make such order is, as a rule, not reviewable as cause for reversal.

Syl. pt. 1, *State v. Highland,* 71 W.Va. 87, 76 S.E. 140 (1912).

 Appellant argues he was unable to appreciate the necessity of an independent autopsy before interment because the State failed to immediately disclose evidence indicating that the victim might have survived for a period of time after being shot. This standard would have essentially required the State to develop its theory of the case and share it with defense counsel almost as soon as appellant was charged with the crime. Appellant cites no authority holding that these circumstances constitute reversible error.

We find that, in light of the wealth of evidence made available to the defense upon which to base an independent opinion, it was not plainly necessary and essential to justice that the body be exhumed in order that appellant's pathologist could perform another autopsy. Thus, we find that the trial court did not abuse its discretion in refusing to order the exhumation of the victim's body.

### III.

Appellant argues the trial court improperly denied three of his jury instructions. The instructions were Defendant's Instruction No. 11, Defendant's Instruction No. 12, and Defendant's Instruction No. 39. Defendant's Instruction No. 11 stated:

The Court instructs the jury that the State in part relies upon circumstantial evidence, and the jury is further instructed that circumstantial evidence should always be scanned with caution, and such evidence, to sustain the verdict of guilt, must be of such character as to produce a moral conviction of guilt beyond all reasonable doubt. *State v. Williams,* 98 W.Va. 458, 127 S.E. 320 (1925).

Defendant's Instruction No. 12 stated:

The Court instructs the jury that the testimony you have heard from law enforcement officials, including the testimony of any state troopers, sheriffs, deputy sheriffs, or policemen, is not entitled to any greater weight and is not more credible than the testimony of any other witnesses simply because it is the testimony of such a law enforcement officer. *State v. Hamrick,* 160 W.Va. 673, 236 S.E.2d 247 (1977).

Defendant's Instruction No. 39 stated:

The Court instructs the jury that mere evidence of a coverup does not indicate that the absolute defense of self-defense of another is not applicable. Therefore, you should consider all of the facts and circumstances regarding the absolute defense of self-defense of another regardless of the fact that there has been evidence of a cover up. The defendant, Timothy Mark McKenzie, has not been charged with any crime regarding the cover up or the improper disposal of a body.

In lieu of these instructions, the court gave the following instruction relating to the matter covered in Defendant's Instruction No. 11.

You may also consider either direct or circumstantial evidence.... "Circumstantial evidence" is proof of other facts and circumstances which from the usual connection of things and from the relation of cause and effect leads to the reasonable conclusion that the facts sought to be proved exists. The law makes no distinction between the weight to be given to either direct or circumstantial evidence. It requires only that before a defendant can be convicted you must carefully weigh all the evidence and be convinced of the Defendant's guilt beyond a reasonable doubt and to the actual exclusion of every other reasonable hypothesis of innocence.

Later, the court gave the following instruction in lieu of Defendant's Instruction No. 12:

The number of witnesses testifying on one side or the other on any issue is not alone the test of the credibility of the witnesses and the weight of the evidence. If warranted by the evidence, you may believe one witness against a number of witnesses testifying differently. The tests are: How truthful is the witness and how convincing is his or her evidence in the

light of all the evidence and circumstances shown?

In determining the credit and weight you will give to the testimony of any witness who has testified before you, you may consider if found by you from the evidence:

his or her good memory or lack of memory;

his or her interest or lack of interest in the outcome of the trial;

his or her demeanor or manner of testifying;

his or her opportunity and means or lack of opportunity and means of having knowledge of the matters concerning which he or she testified;

the reasonableness or unreasonableness of his or her testimony;

his or her apparent fairness or lack of fairness and

From these and all other conditions and circumstances appearing from the evidence, you may give to the testimony of the witness such credit and weight as you believe it is entitled to receive.

Instead of Defendant's Instruction No. 39, the court instructed the jury as follows:

The court instructs the jury that when a person reasonably apprehends that another intends to attack him or another for the purpose of killing or doing serious bodily harm to him or another, then such person has a right to arm himself for his own necessary self-protection, or the protection of another, and in such case, no inference of malice, willfulness, deliberation and intent can be drawn from the fact. If Patricia Jones was not the aggressor, and the defendant, Timothy Mark McKenzie, had reasonable grounds to believe and actually did believe that she was in imminent danger of death or serious bodily harm from which he could save her only by using deadly force against Stephanie Cain, the defendant, Timothy Mark McKenzie, had the right to employ deadly force in order to defend Patricia Jones.

In *State v. Derr*, 192 W.Va. 165, 179, 451 S.E.2d 731, 745 (1994), we said:

In reviewing the adequacy of a trial court's choice and selection of jury instructions, we accord the trial court much discretion and will not reverse provided that the instructions, taken as a whole, adequately state the controlling law. Furthermore, the trial court has broad discretion in determining the wording of the jury instructions. As long as the jury instructions given by the trial court adequately and accurately cover the substance of the requested instructions, there is no abuse. *State v. Beegle*, 188 W.Va. 681, 686–87, 425 S.E.2d 823, 828–29 (1992).

We recently explained the standard of review as follows:

Jury instructions are reviewed by determining whether the charge, reviewed as a whole, sufficiently instructed the jury so they understood the issues involved and were not misled by the law. A jury instruction cannot be dissected on appeal; instead, the entire instruction is looked at when determining its accuracy. The trial court, therefore, has broad discretion in formulating its charge to the jury, so long as it accurately reflects the law. Deference is given to the circuit court's discretion concerning the specific wording of the instruction, and the precise extent and character of any specific instruction will be reviewed for an abuse of discretion.

Syl. pt. 15, *State v. Bradshaw*, 193 W.Va. 519, 457 S.E.2d 456 (1995).

We have also very clearly stated when a trial court's refusal to give a requested instruction is reversible error. In syllabus point 11 of *State v. Derr, supra*, we said:

A trial court's refusal to give a requested instruction is reversible error only if: (1) the instruction is a correct statement of the law; (2) it is not substantially covered in the charge actually given to the jury; and (3) it concerns an important point in the trial so that the failure to give it seriously impairs a defendant's ability to effectively present a given defense.

As stated above, this Court has previously said that it is not error to refuse to give an instruction if the principle of law is adequately covered by another instruction. In the case at bar, the trial court's instructions properly instructed the jury on the circum-

stantial evidence question. Further, we believe that Defendant's Instruction No. 12 would have unduly highlighted the testimony of the police officers, and that the jury was properly instructed on the credibility of witnesses. Lastly, the Court believes that the defense of defense of another, which was the subject of Defendant's Instruction No. 39, was covered by the charge given by the court.

## IV.

The next claim is that the trial court erred in failing to order complete disclosure of an entire police report prepared by Sergeant James Manning pursuant to Rule 26.2 of the West Virginia Rules of Criminal Procedure.[4]

■ Appellant argues that *State v. Miller*, 184 W.Va. 492, 401 S.E.2d 237 (1990) (per curiam), appears to modify Rule 26.2 and requires the production of the entire report if the author testifies. The State argues that the excised material was not discoverable because it did not relate to the subject matter of the officer's direct testimony and that the defense waived any objection to the trial court's initial ruling by failing to press for an *in camera* review of the report. Prior to trial, the trial court had issued a standing order directing the State to deliver witness statements to the defense the night before a witness testified. At trial, a question arose as to whether Sergeant Manning's report had

been disclosed as required by that order. The trial court ruled that the report was discoverable in part, but the court permitted the State to redact "statements attributable to individuals interviewed by the police", in part because of hearsay problems. The court obtained an unredacted copy of the report and advised defense counsel to request additional disclosure if counsel found it necessary. The record fails to disclose that defense counsel made any further request of the court for any portion of the report. It appears from the record that those portions of the report needed by the defense related to Sergeant Manning's own statements and that those portions were provided to defense counsel. Since defense counsel obtained the police officers' own statements and made no further request pursuant to the court's ruling, we conclude that the trial judge committed no reversible error in this sequence of events.

## V.

Appellant next claims the trial court erred by exempting both Sergeant James Manning and Captain Rick Miller from the sequestration order. The State filed a motion to exempt both officers. Appellant objected to the motion and asked the court to permit the State to designate one individual to be exempt, consistent with Rule 615 of the West Virginia Rules of Evidence.[5] Appellant con-

---

4. Rule 26.2 of the West Virginia Rules of Criminal Procedure states, in pertinent part:

**Rule 26.2. Production of statements of witnesses.**

(a) *Motion for production.*—After a witness other than the defendant has testified on direct examination, the court, on motion of a party who did not call the witness, shall order the attorney for the state or the defendant and the defendant's attorney, as the case may be, to produce for the examination and use of the moving party any statement of the witness that is in their possession and that relates to the subject matter concerning which the witness has testified.

(b) *Production of entire statement.*—If the entire contents of the statement relate to the subject matter concerning which the witness has testified, the court shall order that the statement be delivered to the moving party.

(c) *Production of excised statement.*—If the other party claims that the statement contains privileged information or matter that does not

relate to the subject matter concerning which the witness has testified, the court shall order that it be delivered to the court in camera. Upon inspection, the court shall excise the portions of the statement that are privileged or that do not relate to the subject matter concerning which the witness has testified, and shall order that the statement, with such material excised, be delivered to the moving party. Any portion of the statement that is withheld from the defendant over his or her objection shall be preserved by the attorney for the state, and, if the defendant appeals a conviction, must be made available to the appellate court for the purpose of determining the correctness of the decision to excise the portion of the statement.

5. Rule 615 of the West Virginia Rules of Evidence states:

**Rule 615. Exclusion of witness.**

At the request of a party the court shall order witnesses excluded so that they cannot hear

cedes that the question of sequestration is within the discretion of the trial court, but summarily concludes, without explanation, that the court acted arbitrarily to the prejudice of his rights. Appellant also claims the State should have called the excluded officers to testify first, pursuant to *State v. Harriston*, 162 W.Va. 908, 253 S.E.2d 685 (1979).

 The State argues that the trial court did not abuse its discretion by exempting the two officers from the sequestration order. The general rule regarding sequestration of witnesses is stated in syllabus point 4 of *State v. Wilson*, 157 W.Va. 1036, 207 S.E.2d 174 (1974), as follows:

> The question as to which witnesses may be exempt from a sequestration of witnesses ordered by the court lies within the discretion of the trial court, and unless the trial court acts arbitrarily to the prejudice of the rights of the defendant the exercise of such discretion will not be disturbed on appeal.

This Court further clarified the rule regarding police officers in syllabus point 6 of *Wilson*:

> The rule with regard to excluding police officers from a sequestration of witnesses is that it is not error to do so if the testimony of such police officers is not crucial to the state's case and not prejudicial to the defendant.

 In its motion to exempt Captain Miller and Sergeant Manning from sequestration, the State argued that the assistance and first-hand knowledge of both officers would be valuable to the presentation of the case. The officers were involved with different aspects of the investigation. Captain Miller became involved on December 26, 1992, when he became aware of the missing persons report on the victim. Sergeant Manning became involved in the investigation after the victim's body was found on March 27, 1993.

We find that neither officer's testimony was crucial to the State's case and was not used to establish appellant's guilt. Therefore, we find no prejudicial error in the trial court's ruling excluding both officers from sequestration. However, for future reference, we encourage the better practice of excluding only one officer from sequestration to assist the State in the presentation of its case, and that witness should ordinarily be called first to testify. *State v. Harriston*, 162 W.Va. 908, 253 S.E.2d 685 (1979).

## VI.

Appellant assigns as error the trial court's refusal to admit into evidence various items offered by appellant, including a microcassette recording, a drawing, and various records. Appellant offered a microcassette recording of conversation between himself and the victim, which was obtained from his apartment by search warrant by Corporal Manning. He claims the taped conversations were relevant because they tend to support his contentions that the victim was psychologically and physically abusive and an unfit parent. The State objected on the basis that the conversations were self-serving and irrelevant as to the trial of this case. The court ruled that the tape was self-serving because, to the court's understanding, the tape was made because appellant was planning to file custody papers and this was his way of documenting information. Also, the court said the tape need not be admitted because the witness was on the stand and could testify to the facts regarding his relationship with the decedent.

 Rule 401 of the West Virginia Rules of Evidence defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." This definition was recognized in syllabus point 2 of *State v. Maynard*, 183 W.Va. 1, 393 S.E.2d 221 (1990). This Court recognized the trial court's discretion in ruling on the admissibility of evidence in

---

the testimony of other witnesses, and it may make the order of its own motion. This rule does not authorize exclusion of (1) a party who is a natural person, or (2) an officer or employee or a party which is not a natural person designated as its representative by its attorney, or (3) a person whose presence is shown by a party to be essential to the presentation of the party's cause. (As amended by order entered June 15, 1994, effective July 1, 1994.)

syllabus point 2 of *State v. Peyatt*, 173 W.Va. 317, 315 S.E.2d 574 (1983): " 'Rulings on the admissibility of evidence are largely within a trial court's sound discretion and should not be disturbed unless there has been an abuse of discretion.' *State v. Louk*, [171 W.Va. 639], 301 S.E.2d 596, 599 (1983)." In light of these principles, we cannot say that the trial court abused its discretion in refusing to allow the contents of the tape into evidence.

■ Appellant next assigns as error the trial court's refusal to admit into evidence a drawing of a knife that the decedent supposedly took to appellant's apartment on the night of the shooting. Appellant claims he made the drawing at his first meeting with the court-appointed counsel in April, 1993. He further claims the drawing was not discoverable under Rule 16 of the West Virginia Rules of Criminal Procedure [6] because he did not expect to introduce it until the prosecuting attorney, at trial, accused defense counsel of conspiring with appellant in asserting the defense of another. The State argues that the fact that the drawing was not disclosed during discovery is reason enough to affirm the trial court's ruling regarding the inadmissibility of the drawing. The trial judge heard arguments regarding the admissibility of the drawing out of the hearing of the jury. In ruling on admissibility, the court stated:

> I'm not going to allow it to be admitted. You can't convince me that you didn't know that that argument [that he made this up after he got arrested] was going to be made by the State when he gives five or six or seven different statements before he's arrested, and it's not until after he's arrested that he starts talking about self-defense, that there wouldn't have been some argument by the State about the knife and that it was a recent fabrication of the self-defense.... If nothing else, you

should have given it to them out of an abundance of precaution.

We cannot say the trial court abused its discretion in refusing to allow the drawing into evidence.

As to the alleged prejudicial remarks made by the prosecutor, we have reviewed them and find that while they are possibly improper, the comments made here did not prejudice the appellant or result in manifest injustice. This Court has clearly stated: " 'A judgment of conviction will not be reversed because of improper remarks made by a prosecuting attorney ... to a jury which do not clearly prejudice the accused or result in manifest injustice.' Syllabus Point 1 in part, *State v. Dunn*, [162 W.Va. 63], 246 S.E.2d 245 (1978)." Syl. pt. 2, *State v. Brewster*, 164 W.Va. 173, 261 S.E.2d 77 (1979).

■ Appellant next assigns as error the trial court's refusal to admit into evidence appellant's education records; medical records of the victim, medical records of the infant child; and police response records regarding the Time Out Bar. Appellant sought to introduce his education records, claiming they indicate that he did not have a history of violent or problematic behavior in school. Appellant attempted to introduce some of the victim's medical records to show that she was once admitted to the hospital while intoxicated and a second set, offered to show that the victim suffered from a cardiac condition which could have caused her to die instantly upon the bullet entering her skull. Records from the bar were offered to show that police were called to the bar from time to time.

■ As stated above, rulings on the relevancy and admissibility of evidence are largely within a trial court's sound discretion and will not be disturbed on appeal unless there has been an abuse of discretion. After a careful review of the record and consider-

---

**6.** Rule 16(b)(1)(A) of the West Virginia Rules of Criminal Procedure states:

**Rule 16. Discovery and inspection.**

\*　　\*　　\*　　\*　　\*　　\*

(b) *Disclosure of evidence by the defendant.*— (1) Information subject to disclosure.—(A) Documents and tangible objects.—If the defendant requests disclosure under subdivisions (a)(1)(C) or (D) of this rule, upon compliance

with such request by the state, the defendant, on request of the state, shall permit the state to inspect and copy or photograph books, papers, documents, photographs, tangible objects or copies or portions thereof, which are within the possession, custody or control of the defendant and which the defendant intends to introduce as evidence in chief at the trial.

ation of the appellant's assertions, we find that the trial court carefully considered the questions raised, in accord with the applicable rules of evidence and the decided cases relating to them, and did not abuse its discretion regarding the relevancy and admissibility of this evidence. We also note that the court excluded the hospital records of the victim because of a failure of authentication under Rule 901 of the West Virginia Rules of Evidence [7] and the failure to comply with the special requirements of W.Va.Code §§ 57–5–4a through 4d. We find no error in the court's application of those principles.

## VII.

Appellant argues that the trial court also erred by admitting various items of real evidence. He claims it was error to admit a redacted videotape of the apartment where the decedent was shot; the cardboard box in which the decedent's body was found and her sneakers; and photographs of the decedent and the infant child.

First, we will discuss the redacted videotape of the search of appellant's residence, where the decedent was shot. Appellant contends the tape was not relevant because it did not represent the apartment as it was on the night of the murder since portions of the carpet it showed had been cut out for investigative purposes, and that it was unnecessary because the State introduced a diagram of the apartment. Appellant also claims that the tape's probative value was outweighed by its prejudicial effect under Rule 403 of the West Virginia Rules of Evidence.[8]

Rule 403 of the West Virginia Rules of Evidence establishes a balancing test permitting the exclusion of relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." A trial court's rulings under Rule 403 "are left to the sound discretion of the trial judge." *State v. Dillon,* 191 W.Va. 648, 661, 447 S.E.2d 583, 596 (1994). This Court said in syllabus point 5 of *State v. Bass,* 189 W.Va. 416, 432 S.E.2d 86 (1993):

> "Rules 402 and 403 of the *West Virginia Rules of Evidence* [1985] direct the trial judge to admit relevant evidence, but to exclude evidence whose probative value is substantially outweighed by the danger of unfair prejudice to the defendant." Syllabus Point 4, *Gable v. Kroger Co.,* 186 W.Va. 62, 410 S.E.2d 701 (1991).

We find that the trial court properly admitted the videotape showing the apartment in which the victim was shot. The tape gave the jury a visual orientation of the place were the victim was shot and the one change in circumstance noted was explained by testimony. No evidence was presented to indicate the basic layout was changed since the date of the murder.

Appellant next complains the trial court committed error by admitting into evidence the cardboard box in which the victim's body was found and the victim's sneakers. Appellant contends that, under Rule 403 of the West Virginia Rules of Evidence,

---

7. Rule 901 of the West Virginia Rules of Evidence states, in pertinent part:

 **Rule 901. Requirement of authentication or identification.**

 (a) *General provision.*—The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

 (b) *Illustration.*—By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this rule:

 \* \* \* \* \* \*

 (10) Methods provided by statute or rule.— Any method of authentication or identification provided by the Supreme Court of Appeals of West Virginia or by a West Virginia statute.

8. Rule 403 of the West Virginia Rules of Evidences states:

 **Rule 403. Exclusion of relevant evidence on grounds of prejudice, confusion, or waste of time.**

 Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

this evidence should not have been admitted because its prejudicial effect substantially outweighed its probative value. Defense counsel objected to the admission of this evidence during an *in camera* hearing; however, when the evidence was offered at trial, defense counsel said there was "[n]o objection". We find the court did not abuse its discretion in weighing the admissibility of this evidence and note further that this objection was apparently waived at trial.

 We consider that the admission into evidence of the sneakers may be seen as probative for identification purposes. The victim had written on her shoes with an ink pen. There was no objection on the basis of Rule 403, but rather regarding the cumulative nature of the shoes. We fail to see any prejudice arising from their admission into evidence and find that the trial court did not abuse its discretion.

Appellant also assigns as error the trial court's failure to exclude a photograph of the victim prior to her death and a photograph of the infant child. Appellant contends the photographs were not relevant, had no probative value and were offered solely to appeal to the emotions and passions of the jury. Appellant relies in part on *State v. Ashcraft*, 172 W.Va. 640, 309 S.E.2d 600 (1983), which we do not find applicable. Bearing in mind the discretion of the court with respect to the admission of evidence, we find no error. It appears that the photograph of the victim was relevant to identify the victim. The same picture was on the missing persons flyer that was admitted into evidence, with no objection from defense counsel. The photograph of the child may be seen as relevant to motive.

### VIII.

Finally, appellant claims that the trial court erred in failing to grant his motion for judgment of acquittal because the State did not prove malice or negate defense of another beyond a reasonable doubt.

Motions for acquittal are reviewed under the following standard:

" ' "Upon motion to direct a verdict for the defendant, the evidence is to be viewed in light most favorable to prosecution. It is not necessary in appraising its sufficiency that the trial court or reviewing court be convinced beyond a reasonable doubt of the guilt of the defendant; the question is whether there is substantial evidence upon which a jury might justifiably find the defendant guilty beyond a reasonable doubt." *State v. West*, 153 W.Va. 325, 168 S.E.2d 716 (1969).' Syl. pt. 1, *State v. Fischer*, 158 W.Va. 72, 211 S.E.2d 666 (1974)." Syl. pt. 10, *State v. Davis*, 176 W.Va. 454, 345 S.E.2d 549 (1986).

Syl. pt. 6, *State v. Garrett*, 195 W.Va. 630, 466 S.E.2d 481 (1995). We find that the evidence, viewed in the light most favorable to the State, is sufficient for a jury to find malice when appellant killed Ms. Cain and not in defense of another.

Appellant's conviction of second degree murder in the Circuit Court of Wood County is hereby affirmed.

Affirmed.