JOURNAL ENTRY and OPINION
{¶ 1} Appellant Marcel Charley appeals from his convictions for aggravated burglary, aggravated robbery, felonious assault, and firearm specifications on all counts. Charley assigns nine errors for our review.[1]
 {¶ 2} After reviewing the record and law, we affirm Charley's convictions. The apposite facts follow.
 {¶ 3} The Cuyahoga County Grand Jury indicted Charley in two separate indictments. One indictment involved an aggravated murder with a death penalty specification which occurred on October 4, 2002. The other indictment concerned Charley's robbery of four men on September 29, 2002, which consisted of four counts of aggravated robbery, four counts of aggravated burglary, one count of felonious assault, and firearm specifications on all counts. The trial court granted the defendant's motion to sever the aggravated murder case from the robbery case. The jury trial then proceeded on the robbery indictment.
 {¶ 4} Prior to trial, Charley's counsel moved to suppress the victims' identification of Charley as unduly suggestive and unreliable. After conducting a hearing, the trial court denied the motion. The matter then proceeded to trial.
 {¶ 5} Michael Carlozzi testified Marcel Carley robbed him on September 27, 2002 at gunpoint. Carlozzi performs restoration of property for insurance companies which hire his company, Craftmaster Restoration. He is the company's project manager. On the date in question, he went to East 135th and Kinsman to place tarp on a leaking roof. When Carlozzi arrived at the home around 2:30 p.m., it was securely locked and no one was inside. He waited for the rest of the Craftmaster crew to arrive to assist him, which consisted of Jason Gadouri, Jeremy Sobotka, and Francisco Ortiz. When they arrived, they entered the home together. As they walked into the living room, Carlozzi heard a voice he did not recognize. He turned and saw an African-American male pointing a gun at Francisco. He described the man as about 6'2" and dressed all in black with a black baseball hat. Carlozzi threw his wallet down when he heard the gun go off, and ran to the attic to hide.
 {¶ 6} Jason Gadouri testified that as they walked into the living room he heard a loud voice. He saw an African-American male about 6'1" to 6'2" waving a gun around. The man pointed the gun at Ortiz and shot him in the arm. Gadouri ran and hid in the basement.
 {¶ 7} Jeremy Sobotka testified he was in the middle of the dining room, which is connected to the living room, when he heard someone say, "Everybody down and give me your money." According to Sobotka, the area where the man was standing was well lit because the front door was wide open, and the dining room light was on. He described the robber as a tall, slim African-American male, with scruffy hair on his face. He was dressed all in black with a black baseball cap. Jeremy dropped to the ground, but continued to observe the robber.
 {¶ 8} He saw the man point the gun at Ortiz and shoot. As Ortiz tried to get his wallet out, he was shot again. Sobotka attempted to hand his wallet to the robber, but the robber indicated he only wanted the cash, so Sobotka gave him the cash he had. As the robber leaned down for the cash, Sobotka looked him right in the eye and noticed he had a scar between his wide-set eyes. After taking the money, the robber left. Sobotka, with the help of Gadouri, placed the profusely bleeding Ortiz in the van and searched for help. They were able to wave down a policewoman a short distance away who called for back-up and an ambulance.
 {¶ 9} About a week after the incident, Sobotka gave the police his statement and identified Charley from a stack of photographs given to him by the police. He stated he recognized the photograph of Charley due to Charley's scar and pronounced Adams apple. Sobotka positively identified Charley as the robber.
 {¶ 10} Francisco Ortiz testified he was the last of the group to walk into the house. He heard a noise behind him as he walked into the living room. He turned and saw a man with a gun. Although the house windows were boarded up, Ortiz recalled the living room was sufficiently lighted. The front door was open and the lights were on. The man was about two to three feet away.
 {¶ 11} Ortiz stated that the robber ordered the men to get down and to give him their money. The robber shot Ortiz in the arm as Ortiz was attempting to get down on the ground. He could not move because of the gunshot wound. The robber shot him a second time in the hip. Ortiz then reached into his pocket and gave the robber the $4.00. After taking the money from Ortiz and Sobotka, the robber left through the front door.
 {¶ 12} Ortiz stated he looked the robber in the face the entire time and noticed he had a scar between his eyes and that he was about his height or taller, which is 5'11."
 {¶ 13} After getting out of the hospital four days later, Ortiz went to the police station where he gave his statement and identified Charley from the police photographs. He was able to identify Charley after looking at about 20 photographs. He stated he was positive Charley was the robber because he would never forget his eyes. In fact, upon seeing his photograph, he became visibly shaken.
 {¶ 14} Detective Habeeb testified he responded to the scene and retrieved casings from a .380 automatic handgun. While patrolling the area in his vehicle several days later, he spotted a male, matching the description of the suspect. He was later identified as Charley. Charley gave the detective a "hard" look as he passed. By the time the detective turned the vehicle around, Charley had vanished. He spotted Charley on a mountain bike about 20-25 minutes later coming towards him. When Charley saw Habeeb, however, he spun his bike around and began pedaling hard in the other direction. The detective pulled up next to Charley and requested he stop, which he did. Charley then consented to going with the officers to the station where he voluntarily answered questions, gave his fingerprints and allowed his photograph to be taken. The officers asked him whether he had heard about the shooting, and Charley told them he heard it was a "gang thing." The interview lasted about 20 minutes, and Charley was then released.
 {¶ 15} Detective Habeeb testified when the victims came down to the station to give a statement about a week later, only Sobotka and Ortiz said they could identify the robber. After the two men looked through stacks of photographs, they each individually pointed out the photograph of Charley as the robber. The next day Detective Habeeb and his partner attempted to locate Charley at his uncle's house. The uncle informed them Charley left town in a hurry. The detectives learned from Charley's other relatives that Charley was staying at an Elyria housing project. However, Charley was not present when officers arrived at the location. Cleveland police sent a photograph and information regarding Charley to Elyria police.
 {¶ 16} Elyria officers testified they arrested Charley at the housing project on October 18, 2002. Charley had changed his appearance from the photograph by cutting his hair and shaving his face. One of the Elyria detectives testified that while driving Charley to the police station, he told the officer, "things got hot because the cops kept coming around, so he had to get out of there."
 {¶ 17} Detective Willson is responsible for examining firearms and spent shells. He testified that bullets found in a bag in Elyria behind the housing project where Charley was staying, matched the spent casings from the Cleveland robbery scene. According to Willson, microscopically, each weapon imprints the outside of the shells with distinguishing markings. Therefore, at one time, the bullets were all loaded in the same weapon.
 {¶ 18} After considering the above evidence, the jury found Charley guilty as charged. The trial court sentenced Charley to eight years on all counts. The four aggravated robbery counts were ordered to be served consecutively and concurrently with the other counts. The firearm specifications were merged and ordered served consecutively to the other counts. The sentence was ordered to be served concurrently with the thirty-years to life Charley received for the separate aggravated murder case.
 {¶ 19} In his first assigned error, Charley argues, respectively, that the photographic identification procedures were unduly suggestive and produced unreliable pretrial and in-court identifications of Charley that the trial court should have excluded. We find no reversible error.
 {¶ 20} At a hearing on a motion to suppress, the trial court functions as the trier of fact. Accordingly, the trial court is in the best position to weigh the evidence by resolving factual questions and evaluating the credibility of witnesses.[2] On review, an appellate court must accept the trial court's findings of fact if those findings are supported by competent, credible evidence.[3] After accepting such factual findings as true, the reviewing court must then independently determine, as a matter of law, whether or not the applicable legal standard has been met.[4]
 {¶ 21} Charley contends the identification was suggestive because the detectives failed to have the victims separately look through the photographs. However, the evidence indicates that Ortiz and Sobotka were placed in a large room at the police station, which according to Detective Habeeb, was 20 to 30 feet long and contained 22 desks, several tables and computer desks. Detective Habeeb said the room was like a "zoo" it was so loud due to all the activity. Each victim was placed at different ends of the room and given a stack of photographs to review. Therefore, the victims were sufficiently distant from each other that they could not see which photographs were being viewed. Therefore, they were not given the photographs to peruse together, as Charley leads us to believe.
 {¶ 22} Secondly, Charley argues the detectives should have preselected photographs resembling the suspect instead of merely handing the victims stacks of photographs. A review of the photographs indicates they are of men and several women of all different races and ages. The men have various kinds of hairstyles. Some of the men had facial hair and others did not. These photographs were obviously the entire collection of photographs that the station had in its possession. No effort was made to preselect photographs of suspects resembling Charley.
 {¶ 23} Although the better practice is to submit photographs resembling the description of the suspect instead of simply handing the victims a random stack of photographs, reliable identification testimony may be admitted regardless of the flaws in the identification procedure.[5] The test for determining the admissibility of a photographic identification is "`whether under the `totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive.'"[6] As the Court in State v.Jells held:
 {¶ 24} "In order to suppress identification testimony, there must be `* * * a very substantial likelihood of irreparable misidenti-fication.'Simmons v. United States (1968), 390 U.S. 377, 384; accord State v.Perryman (1976), 49 Ohio St.2d 14, 3 O.O.3d 8, 358 N.E.2d 1040, vacated on other grounds (1978), 438 U.S. 911. In Neil v. Biggers (1972),409 U.S. 188, 199-200, the United States Supreme Court set forth the following factors to be considered in examining an identification procedure and its impact:
 {¶ 25} "`* * * [W]hether under the `totality of the circumstances,' the identification was reliable even though the confrontation procedure was suggestive. As indicated by our cases, the factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation. * * *'
 {¶ 26} "The focus, under the `totality of the circumstances' approach, is upon the reliability of the identification, not the identification procedures. State v. Lott (1990), 51 Ohio St.3d 160, 175,555 N.E.2d 293, 308; Manson v. Brathwaite (1977), 432 U.S. 98, 114 (`* * * reliability is the linchpin in determining the admissibility of identification testimony * * *.'); State v. Moody (1978), 55 Ohio St.2d 64,67, 9 O.O.3d 71, 72, 377 N.E.2d 1008, 1010 (`[a]lthough the identification procedure may have contained notable flaws, this factor does not, per se, preclude the admissibility of the subsequent in-court identification.')."[7]
 {¶ 27} In the instant case, each victim testified at trial that although the windows of the home were boarded up, the home was well lit from electrical lights inside and the front door was open. Both Sobotka and Ortiz testified they were focused on the robber's face. Sobotka specifically testified he was noting the robber's physical description in order to provide it to police later. Both men gave a similar description of the suspect to police. Both men also testified to noticing Charley's unusual crescent shaped scar between his eyebrows and both stated they were one hundred percent sure that Charley was the robber both at the pretrial identification and at trial.
 {¶ 28} Accordingly, we agree with the trial court's determination that the identification was reliable under the totality of the circumstances. As a result, we overrule the first assigned error.
 {¶ 29} In his second assigned error, Charley argues that he was denied due process because his counsel was not provided with the written summaries of the oral statements he made to Elyria police as required by Crim.R. 16(B)(1)(a)(ii). Charley had informed the officers on the way to the police station that he was aware there was an arrest warrant out on him in Cleveland He also told the officers that there was a "gang thing" in Cleveland and he had to leave because things were getting "hot" and the police were coming.
 {¶ 30} Crim.R. 16(B)(1)(a)(ii) provides:
 {¶ 31} "Upon motion of the defendant, the court shall order the prosecuting attorney to permit the defendant to inspect and copy or photograph any of the following which are available to, or within the possession, custody, or control of the state, the existence of which is known or by the exercise of due diligence may become known to the prosecuting attorney:
 {¶ 32} "* * *
 {¶ 33} "(ii) Written summaries of any oral statement, or copies thereof, made by the defendant or co-defendant to a prosecuting attorney or any law enforcement officer[.]"
 {¶ 34} In State v. Parson,[8] the Ohio Supreme Court set forth the following three-part test to determine whether a trial court abused its discretion under Crim.R. 16(E)(3) by allowing the admission of an unrecorded oral statement by a co-defendant:
 {¶ 35} "Where, in a criminal trial, the prosecution fails to comply with Crim.R. 16(B)(1)(a)(ii) by informing the accused of an oral statement made by a co-defendant to a law enforcement officer, and the record does not demonstrate (1) that the prosecution's failure to disclose was a willful violation of Crim.R. 16, (2) that foreknowledge of the statement would have benefitted the accused in the preparation of his defense, or (3) that the accused was prejudiced by admission of the statement, the trial court does not abuse its discretion under Crim.R. 16(E)(3) by permitting such evidence to be admitted."
 {¶ 36} The Parson test was later applied by the Ohio Supreme Court, inState v. Bidinost,[9] as to the admission of an unrecorded oral statement of the defendant.
 {¶ 37} Applying Parson and Bidinost to the case sub judice, we first conclude that the state did not willfully violate Crim.R. 16(E)(3). In fact, defense counsel told the court at side bar that the prosecutor had in "good faith" revealed the statements to him that morning. The prosecutor informed the court he had no knowledge the comments were made until the trial commenced and immediately informed defense counsel of the statements upon being informed of them. We next conclude, as to the second and third Parson factors, that Charley has failed to demonstrate how foreknowledge of the statement would have aided in the preparation of his defense or demonstrated unfair prejudice. Had Charley felt that the statement adversely affected his defense, a continuance could have been requested.[10] Charley's second assigned error is overruled.
 {¶ 38} In his third assigned error, Charley argues the trial court erred in instructing the jury that flight could be indicative of guilt. According to Charley, the evidence presented at trial did not support a flight instruction.
 {¶ 39} Evidence of flight is admissible as tending to show consciousness of guilt.[11] It is well within a trial court's discretion to issue an instruction on flight if sufficient evidence exists in the record to support the charge.[12] The trial court in the instant case instructed the jury, over the defendant's objection, that while evidence of flight in and of itself does not raise a presumption of guilt, the jury may consider that evidence in their determination of guilt or innocence.
 {¶ 40} The evidence in the instant case supported such an instruction. There was evidence that upon seeing officers a few days after the robbery, Charley quickly crossed the street and vanished before the officers could turn their vehicle around. Twenty to twenty-five minutes later, the officers saw Charley again on a mountain bike. Charley, upon seeing the officers, quickly spun his bicycle in the other direction and pedaled hard to go in the other direction. There was also evidence that Charley clearly left the jurisdiction of Cleveland by going to Elyria to stay with acquaintances. According to Charley's uncle, he left in a hurry. Therefore, based upon the above evidence, there was sufficient evidence that Charley did attempt to flee from police. Accordingly, Charley's third assigned error is overruled.
 {¶ 41} In his fourth assigned error, Charley argues the trial court erred by refusing to instruct the jury that a police officer's testimony is not to be given any more credibility than any other witness.
 {¶ 42} The Ohio Supreme Court in State v. Group[13] recently addressed this issue and held as follows:
 {¶ 43} "The subject of witness credibility was covered in the general jury charge. The court instructed the jurors that they were the `sole judges of * * * the credibility of the witnesses and the weight of the evidence' and that they must consider `the witness' * * * interest and bias' in judging credibility. Where a trial court gives instructions such as these, which apply equally to all witnesses, there is no need for any special comment or instruction regarding police credibility. State v.Taylor (Feb.9, 1999), Medina App. No. 2783-M, 1999 Ohio App. LEXIS 397, 1999 WL 61619. See, also, Bell v. Philadelphia (1985), 341 Pa.Super. 534,546, 491 A.2d 1386; State v. McKenzie (1996), 197 W. Va. 429, 442-444,475 S.E.2d 521.
 {¶ 44} "Moreover, such a special instruction runs afoul of the principle we enunciated in cases such as Curtis v. State (1925),113 Ohio St. 187, 209-210, 3 Ohio Law Abs. 187, 3 Ohio Law Abs. 387, 3 Ohio Law Abs. 388, 148 N.E. 834, 23 Ohio L. Rep. 322, and State v.Scott, supra, 26 Ohio St.3d at 101, 26 OBR 79, 497 N.E.2d 55: that a trial judge may not single out a particular witness or group of witnesses to discuss their credibility, since such discussion exerts an undue influence on the jury. Accord McKenzie, supra, 197 W. Va. at 444,475 S.E.2d 521 (special instruction on police credibility `would have unduly highlighted' police testimony). We therefore hold that the trial judge did not err by failing to give requested jury instruction No. 18."
 {¶ 45} Likewise, in the instant case, the trial court gave a general instruction regarding the credibility of witnesses. Therefore a specific instruction was not necessary. Charley's fourth assigned error is overruled.
 {¶ 46} In his fifth assigned error, Charley argues the prosecutor engaged in misconduct by eliciting testimony about the drugs and drug paraphernalia found in the Elyria apartment when Charley was not charged with a drug offense. Charley also argues the prosecutor engaged in misconduct during closing argument, when he commented that if Charley was clearly not guilty the judge would not have let the matter go to trial.
 {¶ 47} A prosecuting attorney's conduct during trial does not constitute grounds for error unless the conduct deprives the defendant of a fair trial.[14] The touchstone of a due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor.[15] The effect of the prosecutor's misconduct must be considered in light of the whole trial.[16]
 {¶ 48} We agree the testimony regarding the marijuana and drug paraphernalia found in the apartment where Charley was staying was irrelevant. However, such testimony was not prejudicial given the victims positively identified Charley as the robber. Also, shells matching the gun and shells from the robbery were found in a bag in the woods behind the Elyria apartment complex. Furthermore, the testimony made clear that Charley did not lease the apartment, nor was he living alone on the premises. Therefore, this testimony did not have prejudicial effect on Charley's trial.
 {¶ 49} Regarding the prosecutor's statement in closing argument, the prosecutor stated the following:
 {¶ 50} "The issue is, is the only possible verdict not guilty? Well, you wouldn't have the case right now if that was the only possible verdict because His Honor wouldn't let it go to a jury if that was the case."[17]
 {¶ 51} Charley's counsel immediately objected to the comment, and the trial court sustained the objection and instructed the jury to disregard the statement. A jury is presumed to follow the instructions, including curative instructions, given by a trial judge.[18] We have no reason to conclude the jury did not abide by the trial court's order to disregard the statement. Charley's fifth assigned error is overruled.
 {¶ 52} In his sixth assigned error, Charley argues the court erred by permitting evidence of "other acts" into evidence in violation of Evid.R. 404(B). The other act evidence consists of witnesses testifying to the fact drugs and a scale were found in the Elyria apartment.
 {¶ 53} Evid.R. 404(B) provides, "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."
 {¶ 54} We find that the admission of the evidence regarding drugs and drug paraphernalia did not fall under any of the exceptions to admission of evidence under Evid.R. 404(B). However, in spite of this, an error in the admission of "other act" testimony is harmless when there is no reasonable possibility that the testimony contributed to the accused's conviction.[19] Charley has failed to produce any evidence to convince this court that the jury considered the drugs and drug paraphernalia found at the Elyria apartment during deliberations or that it relied at all on this evidence when it found him guilty of aggravated robbery, aggravated burglary, and felonious assault.
 {¶ 55} Further, the evidence presented against Charley is substantial. Even without testimony about the drugs and drug paraphernalia, a reasonable jury could conclude Charley was guilty. Thus, the admission of this evidence did not contribute to Charley's conviction and merely amounted to harmless error.
 {¶ 56} Although Charley also contends evidence of his alleged drug usage was also admitted, the record indicates that the trial court sustained an objection to this line of questioning, and instructed the jury to disregard the questions. We have no evidence the jury did not follow the instructions. Therefore, we presume they followed the court's order. Accordingly, Charley's sixth assigned error is overruled.
 {¶ 57} In his seventh assigned error, Charley argues his conviction for aggravated burglary was not supported by sufficient evidence because the state failed to establish the building was an "occupied structure" as required pursuant to R.C. 2911.11. Charley contends the home was a vacant home.
 {¶ 58} The standard of review with regard to the sufficiency of evidence is set forth in State v. Bridgeman:[20]
 {¶ 59} "Pursuant to Criminal Rule 29(A), a court shall not order an entry of judgment of acquittal if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt."[21]
 {¶ 60} Bridgeman must be interpreted in light of the sufficiency test outlined in State v. Jenks[22] in which the Ohio Supreme Court held:
 {¶ 61} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence submitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. (Jackson v. Virginia [1979], 443 U.S. 307,99 S.Ct. 2781, 61 L.Ed.2d 560, followed.)"
 {¶ 62} R.C. 2911.11 defines aggravated burglary in relevant part as:
 {¶ 63} "(A) No person, by force, stealth, or deception, shall trespass in an occupied structure * * * when another person other than an accomplice of the offender is present, with purpose to commit in the structure * * * any criminal offense, if any of the following apply"
 {¶ 64} "(1) The offender inflicts, or attempts or threatens to inflict physical harm on another;
 {¶ 65} "(2) The offender has a deadly weapon or dangerous ordnance on or about the offender's person or under the offender's control."
 {¶ 66} R.C. 2909.01 defines an "occupied structure" in relevant part as "any house, building, * * * to which any of the following applies:
 {¶ 67} "(A) Which is maintained as a permanent or temporary dwelling, even though it is temporarily unoccupied, and whether or not any person is actually present."
 {¶ 68} In the instant case, the prior owner was elderly and living in a nursing home. Her daughter was having the place restored in order to complete a pending sale to a new owner, because vandals had damaged the property. Mike Carlozzi of Craftmaster testified the company had been working on the property for the past three months.
 {¶ 69} In State v. Green,[23] the court examined the definition of "occupied structure." In Green the defendant burglarized a home that had sat vacant for two months after the owners had moved to another residence. During that time, the owners had returned to the house on a regular basis to remove personal items, clean and make repairs on the house for the incoming tenant. The Green court concluded:
 {¶ 70} "It is obvious that the General Assembly, in adopting the definition of `occupied structure' found in R.C. 2909.01, intended to broaden the concept of the offense of burglary from one of an offense against the security of habitation, to one concerned with the serious risk of harm created by the actual or likely presence of a person in a structure of any nature. In that context, it is noteworthy that the General Assembly utilized the word `maintained' in division (A), as opposed to `occupied,' although it did use that latter word in division (B), which deals with structures other than dwellings. We believe that the distinction between `maintained' and `occupied' is significant, in the sense that the former alludes more to the character or type of use for which the dwelling is intended to be subjected, whereas the latter is more closely related to the actual use to which the structure is presently being subjected
 {¶ 71} "Thus, a structure which is dedicated and intended for residential use, and which is not presently occupied as a person's habitation, but, which has neither been permanently abandoned nor vacant for a prolonged period of time, can be regarded as a structure `maintained' as a dwelling within the meaning of division (A). In this context, then, division (A) includes a dwelling whose usual occupant is absent on prolonged vacation, a dwelling whose usual occupant is receiving long-term care in a nursing home, a summer cottage, or a residential rental unit which is temporarily vacant. In all these examples, even though the dwelling is not being presently occupied as a place of habitation, that situation is temporary, and persons are likely to be present from time to time to look after the property — to help `maintain' its character as a dwelling."
 {¶ 72} We, likewise, conclude that there was competent, credible evidence from which the jury could conclude that the house was an "occupied structure" under R.C. 2909.01(A). The evidence indicated the house was temporarily vacated by the prior owner who was placed in a nursing home and that the home had been sold to a new owner, but repairs were required before a transfer of title would occur.[24]
 {¶ 73} Charley does not argue the other elements were not proven. However, we note Carlozzi also testified that the Craftmaster crew had been working on the house for the past three months, therefore, there was evidence presented that it was likely someone would be present at the house during the day. There was also evidence that Charley had a gun and threatened and inflicted physical harm. Therefore, evidence in support of all the elements of aggravated burglary was presented.
 {¶ 74} Charley also argues there was insufficient evidence to support his convictions for two counts of aggravated robbery because Mike Carlozzi and Jason Gadouri were not robbed. We disagree.
 {¶ 75} The evidence indicated that Charley walked into the home behind the four men and according to Jeremy Sobotka, said in a loud voice, "everybody down and give me your money." His reference to "everybody" can be construed to his referring to the whole group. All the men, in fact, saw that the robber had a gun. Although, Ortiz and Sobotka, the men physically closest to Charley, were unable to get away, the other two men, Carlozzi and Gadouri, were far enough away to run and hide from Charley. In fact, Carlozzi even threw his wallet on the floor prior to fleeing. Simply because these two victims reacted swiftly to get away from Charley, does not detract from Charley's intent to rob them. Accordingly, Charley's seventh assigned error is overruled.
 {¶ 76} In his eighth assigned error, Charley argues his convictions are against the manifest weight of the evidence, based on the inconsistencies in identification of the suspect provided by the witnesses and because of the introduction of the "other acts" evidence and the flight instruction given by the trial court.
 {¶ 77} "As to the weight of the evidence, the issue is whether the jury created a manifest miscarriage of justice in resolving conflicting evidence, even though the evidence of guilt was legally sufficient."[25]
Citing Thompkins, the Ohio Supreme Court explained what it considered in making this decision: "After reviewing the entire record, weighing all the evidence and all reasonable inferences drawn therefrom, and considering the credibility of the witnesses, we conclude that appellant's conviction was not against the manifest weight of the evidence."[26]
 {¶ 78} First, as we stated above, the "other acts" evidence was not prejudicial and the trial court did not abuse its discretion in giving the jury a flight instruction.
 {¶ 79} Regarding the inconsistency in the victims' description of the gunman by not telling officers about the scar on Charley's forehead and the fact he was wearing a hat, we conclude other evidence outweighed these perceived inconsistencies. The victims testified that in spite of the house being boarded up, the interior was well lit from lights that were turned on inside the house and from the front door, which was wide open. Although Sobotka and Ortiz differed in the length of time of the robbery, both testified they observed the gunman throughout the ordeal and looked in his face. Both Sobotka and Ortiz agreed the gunman was a tall, slim African-American, with wide-set eyes. They also stated he was dressed all in black. Although Ortiz's written statement, which was given at the time of the photo identification did not mention the baseball hat, he did mention that the robber had a "small mark" on his forehead. Sobotka's written statement is not in the record, therefore we are unable to compare his testimony to his written statement.
 {¶ 80} Both victims were positive Charley was the robber, based on his wide-set eyes, which they would never forget. Ortiz also clarified that he did not take a second dose of pain pills as prescribed by his doctor on the day of the photographic identification, because he wanted his mind to be clear. Detective Habeeb testified that Ortiz did not appear to be under the influence of pain medication.
 {¶ 81} Along with this, there was also scientific evidence linking Charley with the crime. Shells found in the vicinity of the Elyria apartment where Charley was staying, matched the shells recovered from the robbery. According to Detective Willson, once loaded into a weapon, shells are imprinted with distinctive markings attributed to the weapon in which they are loaded.
 {¶ 82} Therefore, construing this evidence together, we conclude the jury did not lose its way in resolving the inconsistencies in the testimony. Accordingly, Charley's eighth assigned error is overruled.
 {¶ 83} In his last assigned error, Charley argues the trial court violated his right to due process by failing to provide this court with the box of photographs used for the photographic identification.
 {¶ 84} This error is moot because the prosecutor's office complied with this court's order, ordering the prosecutor to submit color reproductions of the box of photographs as ordered by the trial court. Charley's ninth assigned error is overruled as moot.[27]
Judgment affirmed.
It is ordered that appellee recover of appellant its costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Common Pleas Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Dyke, J., and McMonagle, J., concur.
 APPENDIX ASSIGNMENTS OF ERROR
"I. The trial court erred in allowing the state's witnesses to offer in-court identification when the identification was tainted by unfairly suggestive display of photos, in violation of appellant's right to Due Process guaranteed by Article I, Section 16 of the Ohio Constitution, and the Fourteenth Amendment to the United States Constitution."
"II. The trial court erred by allowing the state to introduce statements attributed to Mr. Charley which were not provided to defense counsel prior to trial, pursuant to Crim.R. 16."
"III. Appellant was denied his Constitutional Rights when the court proceeded over objection to instruct the jury on `Flight,' as there is no rational connection between the alleged flight and evidence of `consciousness of guilt.'"
"IV. Appellant was denied his constitutional rights when the court refused to give a specific jury instruction to the effect that a police officer's testimony is not to be given any more credibility than that of any other witness merely because of his status as a police officer."
"V. The misconduct of the prosecutor violated appellant's rights to a fair trial guaranteed by the Due Process provisions of Article I, Section16 of the Ohio Constitution, and the Fourteenth Amendment of the United States Constitution."
"VI. Prejudicial error was committed by the admission of `other acts' testimony in violations of R.C. 2945.59, Evid.R. 404(B), and appellant's rights under Article I, Section 16 of the Ohio Constitution and theFourteenth Amendment to the United States Constitution."
"VII. The trial court erred in denying appellant's motion for acquittal when the state failed to present sufficient evidence of criminal activity."
"VIII. Appellant's convictions are against the manifest weight of the evidence."
"IX. The appellant was denied Due Process of law in violation of his Ohio and United States Constitutional rights because the trial court failed to provide a complete record of the proceedings."
[1] See appendix.
[2] State v. Mills (1992), 62 Ohio St.3d 357, 366.
[3] State v. Rutherford (1994), 93 Ohio App.3d 586, 592.
[4] Id.
[5] State v. Jells (1990), 53 Ohio St.3d 22, 26-27.
[6] Id. at 27.
[7] Id. at 27.
[8] (1983), 6 Ohio St.3d 442, syllabus.
[9] 71 Ohio St.3d at 456.
[10] State v. Weind (1977), 50 Ohio St.2d 224.
[11] State v. Eaton (1969), 10 Ohio St.2d 145, 160, vacated on other grounds (1972), 408 U.S. 935, 33 L.Ed.2d 750, 92 S.Ct. 2857; State v.Williams (1997), 79 Ohio St.3d 1, 26, 1997-Ohio-407.
[12] State v. Benjamin, Cuyahoga App. No. 80654, 2003-Ohio-281, ¶ 29, 31.
[13] 98 Ohio St.3d 248, 2002-Ohio-7247 at ¶¶ 117,118.
[14] State v. Keenan (1993), 66 Ohio St.3d 402-405; State v. Gest
(1995), 108 Ohio App.3d 248, 257.
[15] Smith v. Phillips (1982), 455 U.S. 209.
[16] State v. Durr (1991), 58 Ohio St.3d 86, 94; State v. Maurer
(1984), 15 Ohio App.3d 239, 266.
[17] TR. at 711.
[18] State v. Loza (1994), 71 Ohio St.3d 61, 75.
[19] Chapman v. California (1967), 386 U.S. 18, 87 S.Ct. 824,17 L.Ed.2d 705. See, also State v. Lytle (1976), 48 Ohio St.2d 391.
[20] (1978), 55 Ohio St.2d 261, syllabus.
[21] See, also, State v. Apanovitch (1987), 33 Ohio St.3d 19, 23; Statev. Davis (1988), 49 Ohio App.3d 109, 113.
[22] (1991), 61 Ohio St.3d 259, paragraph two of the syllabus.
[23] (1984) 18 Ohio App.3d 69.
[24] See, also, State v. Bedow, 2nd Dist. No. 18957, 2002-Ohio-910 (home which was furnished and contained food, but had no occupants other than the owner checking on the home from time to time, constituted an "occupied" structure); State v. Craig (Apr. 8, 1998), 9th Dist. No. 18350 (although tenants were evicted, because dwelling maintained as a residence, it constituted an "occupied" structure); State v. Tornstrom
(Nov. 19, 1998), Cuyahoga App. No. 72898 (vacant house maintained as a dwelling was an occupied structure); State v. Burns (March 31, 1997), 6th Dist. No. L-96-224 (apartment that had been vacant for one month, found to be an "occupied" structure).
[25] State v. Thompkins (1997), 78 Ohio St.3d 380.
[26] State v. Issa (2001), 93 Ohio St.3d 49, 67.
[27] App.R. 15(A)(1)(c).