[Cite as *State v. Ratliff*, 2024-Ohio-61.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
ROSS COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| | : | Case No. 22CA22 |
| Plaintiff-Appellee, | : | |
| | : | |
| v. | : | <u>DECISION AND JUDGMENT</u> |
| | : | <u>ENTRY</u> |
| CAITLIN RATLIFF, | : | |
| | : | **RELEASED: 01/05/2024** |
| Defendant-Appellant. | : | |

<u>APPEARANCES:</u>

Tim Young, Ohio Public Defender, and Ohio Assistant Public Defender, R. Jessica Manungo, Assistant Public Defender for appellant.

Jeffrey C. Marks, Ross County Prosecuting Attorney, and Pamela C. Wells, Ohio Assistant Ross County Prosecutor, Chillicothe, Ohio for appellee.

Wilkin, J.

{¶1} This is an appeal from a Ross County Court of Common Pleas judgment entry that convicted appellant, Caitlin Ratliff ("Ratliff"), of third-degree felony burglary. On appeal Ratliff maintains that her conviction is not supported by sufficient evidence and is also against the manifest weight of the evidence. After reviewing the parties' arguments, the record, and the applicable law, we find her conviction is supported by sufficient evidence and is not against the manifest weight of the evidence. Therefore, we affirm the trial court's judgment of conviction.

BACKGROUND

{¶2} On March 10, 2022, a grand jury indicted Ratliff on a burglary charge in violation of R.C. 2911.12 (A)(3), a third-degree felony. In a two-day trial

beginning on May 11, 2022, Ratliff was tried on the charge of burglary before a jury.

{¶3} The state's first witness was Ross County Sheriff's Deputy, Ben Roderick, who testified that on February 2, 2022, he was dispatched to 7149 County Road 550 to investigate a burglary in progress. He stated that it was "overcast" and the ground was "wet" and "muddy." Upon arrival, Roderick noticed a "late model Ford F-150" (pickup truck) parked in the front yard of the house. Roderick stated that a witness, Shane Morris, informed him two suspects had taken his phone, shot at him with a gun, and then ran into the woods behind the house. Roderick and deputy Mitchell attempted to pursue the suspects. However, because the vegetation was so thick, the deputies set up a perimeter to the east and south of the woods. They called for a K-9 unit so they could track the suspects. A third deputy was patrolling nearby roadways looking for the suspects.

{¶4} While deputy Roderick was waiting for the K-9 unit, Mike Lemaster, the homeowner showed up. Lemaster informed Roderick that there were a "bunch of his items" that had been taken from his house that were in the pickup truck.

{¶5} After unsuccessfully investigating a nearby "ping" on Morris's stolen cell phone, Roderick returned to Lemaster's property. At that time, Morris informed Roderick that he had just seen an orange-colored vehicle stop about 1/8 of a mile up the road and that two persons who had emerged from the tree line got into the back of the vehicle. Believing these persons might be the

suspects, Roderick got in his patrol vehicle and attempted to find that vehicle and investigate. Roderick along with a state trooper executed a "felony stop" of the vehicle, which contained five persons, including Ratliff who was seated in the rear of the vehicle. Roderick described Ratliff as "disheveled" and "covered in mud."

{¶6} The state's next witness was Shane Morris who lived in the Frankfort, Ohio area his entire life. He testified that on February 2, 2022, while taking a load of scrap down County Road 550 to Pleasant Valley, he noticed a pickup truck in the front yard of Lemaster's house that did not belong to Lemaster, who he had known for 30 years. Morris called Lemaster and told him about the pickup truck, but Lemaster initially thought that someone's truck had broken down.

{¶7} After leaving the scrapyard, Morris again passed Lemaster's house and noticed the pickup truck was still there, so he pulled into the property in front of the truck to investigate. Morris saw two persons coming out of the house "carrying stuff," so Morris attempted to call 911 believing he was witnessing a theft. He described one of the suspects as a male wearing a coat and the other as a woman wearing a hoodie. Morris attempted to take pictures of the license plate of the pickup truck. However, the suspects got into the pickup truck, rammed Morris's vehicle and then got stuck in the mud. The male suspect emerged from the pickup truck with a gun and ordered Morris to give him his phone, and Morris complied. The suspect then ordered Morris to push the pickup truck out of the mud. Instead of pushing the pickup truck out of the mud,

Morris put his vehicle in reverse and fled the property. The suspect shot at him as he fled. Morris drove up the road to his friend's home and called the authorities on a landline. Neighbors told Morris that they saw the suspects running through the woods, so he drove down the road to his parents' house, which was close by, to warn them of the situation.

{¶8} Morris then returned to Lemaster's house and spoke with the deputy about the robbery. Morris identified one of the suspects who had been apprehended from the orange Honda Element as the defendant herein, Caitlin Ratliff, whom he had known for approximately 15 years.

{¶9} The state's next witness was Michael Lemaster, the property owner whose home was burglarized. Lemaster stated that he received two calls from Morris with the latter informing him that someone had broken into his house at the 7149 County Road 550 address. When Lemaster arrived, deputies were searching for the suspects. The suspects had apparently entered the garage through an unlocked door and then broke a window between the garage and the house to gain entry into the house. Lemaster identified personal property that was missing from the house including guns, hunting knives, coins, and jewelry.

{¶10} Lemaster testified that he had not lived in the house for more than a year and does not stay overnight there, but he usually stops by the property "at least once a day" to pick up mail. He also testified that he maintains the utilities (water, electricity, etc.) at the house. And he makes repairs, e.g., keeping the sump pump working.

{¶11} The state's next witness was detective Brenton Davidson of the Ross County Sheriff's Office.  He conducted an investigation of this burglary.  His investigation included examining the orange Honda Element in which Ratliff was caught, the residence at the 7149 County Road 550 address, and the pickup that was at the house at the time of the burglary.  He discovered stolen items in the orange Honda Element.  He spoke to Lemaster, took photographs, as well as marked and inventoried the stolen property from Lemaster's house that was in the truck and the orange Honda Element.  Davidson also found Morris's cell phone in Lemaster's back yard.  A purse was recovered from the truck that contained Ratliff's Ohio identification card and her Visa debit card.

{¶12} Detective Addy of the Ross County Sheriff's Office was the state's last witness.  He also investigated this burglary.  He interviewed all five persons who were in the orange Honda Element.  He found a jewelry box and knives on the floorboard of the Element that Lemaster identified as his property.  He also found a 9 millimeter pistol that did not belong to Lemaster.  He testified that Ratliff told him that she was with Mr. Stodgel on the day of the burglary but did not participate in the burglary.  She claimed that Stodgel told her that he stopped at Lemaster's house because he was looking for a house to rent, but claims that once they were there, he committed the burglary on his own.

{¶13} Detective Addy testified that Ratliff was wearing a jacket when she was in the orange Honda Element and a pocket in that jacket contained a woman's watch that Lemaster identified as having belonged to his deceased wife and had been in her bedroom.

**{¶14}** Prior to retiring to deliberate, the judge instructed the jury on the applicable law, including R.C. 2909.01(C)(1-4), which defines an "occupied structure" for purposes of the burglary offense.

**{¶15}** While deliberating, the jury asked "is there any clarification, apart from what we have been provided, about temp – temporary dwelling? Is there any definition?" After conferring with both counsel for the state and the defendant, the court addressed the jurors and informed them that there was no legal definition of "temporary dwelling." "The entire definition of occupied structure is specifically provided by the Ohio Revised Code Section 2909.01(C) [sic.] and I gave [sic.] you that entire definition." The court then proceeded to reread R.C. 2909.01(C) to the jury.

**{¶16}** The jury found Ratliff guilty as charged. On May 17, 2022, the court issued a judgment of conviction and scheduled sentencing for May 26, 2022. After that hearing, the court sentenced Ratliff to 30 months in prison and up to 2 years of post-release control. It is this judgment that Ratliff appeals.

ASSIGNMENTS OF ERROR

I. CAITLIN RATLIFF'S CONVICTION FOR BURGLARY IS NOT SUPPORTED BY SUFFICIENT EVIDENCE. FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND SECTION 10, ARTICLE I OF THE OHIO CONSTITUTION R.C. 2911.12(A)(3); R.C. 2909.01(C).

II. CAITLIN RATLIFF'S CONVICTION OF BURGLARY IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE, IN VIOLATION OF THE DUE PROCESS CLAUSE OF THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND SECTION 16, ARTICLE I OF THE OHIO CONSTITUTION. STATE V. THOMPKINS, 78 OHIO ST.3D 380, 387, 678 N.E.2D 541 (1997).

## I. First Assignment of Error

{¶17} In her first assignment of error, Ratliff claims that her conviction for burglary is not supported by sufficient evidence. Ratliff maintains that a third-degree felony burglary offense requires proof that the offender committed a trespass in an "occupied structure" to commit a criminal offense. She asserts four different arguments why Lemaster's house was not an occupied structure under R.C. 2909.01(C) to support her burglary conviction.

{¶18} Ratliff first argues that Lemaster's home was not maintained as a "permanent or temporary dwelling" under 2909.01(C)(1) because as of the date the burglary herein occurred, he had not lived in the house for two years. In other words, Lemaster has not "maintained" his house as a "permanent or temporary dwelling" so it was not an occupied structure under R.C. 2909.01(C)(1). Therefore, she argues, because there was no "occupied structure," which is a necessary element of burglary, there was insufficient evidence to support her burglary conviction.

{¶19} Ratliff claims that a recent Supreme Court decision, *State v. Whitaker*, 169 Ohio St.3d 647, 2022-Ohio-2840, 207 N.E.2d 677, supports her argument. In *Whitaker*, the house in question had been unoccupied for years. It had been gutted for a renovation so it remained unoccupied. Under these circumstances, the Court determined that the house was "not maintained as a permanent or temporary dwelling[,]" so it was not occupied under R.C. 2909.01(C)(1). *Id.* at ¶ 63

{¶20} Ratliff claims that *Whitaker* is persuasive in this case because the evidence herein shows that Lemaster did not live in his house at the time of the theft in this case and had not lived there for at least two years prior to that date. Thus, consistent with *Whitaker*, Lemaster's house also did not qualify as a "permanent or temporary habitation" under R.C. 2909.01(C)(1) and therefore was not occupied under that provision and as a result would not support a burglary charge.

{¶21} Ratliff also argues that Lemaster's house was not "occupied as the permanent or temporary habitation of any person" at the time of the offense so it was not occupied under R.C. 2909.01(C)(2). Thus, there would be insufficient evidence to support her burglary conviction.

{¶22} Ratliff further argues that there is no evidence that Lemaster's house was specifically adapted for overnight accommodations under R.C. 2909.01(C)(3). Again, there would be insufficient evidence to support her conviction.

{¶23} Finally, she alleges that "no one was present at the time or likely to be present at the house at the time of the trespass and theft" because the incident occurred when Lemaster would likely be at work. Therefore, Lemaster's home did not qualify as an occupied structure under 2909.01(C)(4) and would not support her burglary conviction.

{¶24} In response, the state maintains that "the relevant inquiry in determining whether a structure is occupied concerns the residential purpose of the dwelling, rather than the presence or absence of an occupant." *State v.*

*Green*, 18 Ohio App.3 69, 480 N.E.2d 1128 (3rd Dist. 1984). The state argues a dwelling is "occupied" under R.C. 2909.01(C)(1) "where a dwelling is temporarily not being occupied as a place of habitation and where persons are likely to be present from time to time to look after the property to help maintain its character as a dwelling." *State v. Steen*, 2d Dist. Darke No. 19CA16, 2020-Ohio-4598, ¶ 33.

{¶25} In this case, the state claims that it has carried the burden of showing that Lemaster's house was regularly maintained as a dwelling. The state asserts that Lemaster is at the house daily, he keeps the utilities on, and he receives his mail at the house. "It is a residence where he could go and stay."

{¶26} The state claims that *Whitaker* is distinguishable from this case. In *Whitaker* the house was being "gutted" during its renovation. In this case, unlike *Whitaker,* the house was not gutted and Lemaster maintained furniture and belongings at the house.

{¶27} The state claims that this case is more like *State v. Bell*, 8th Dist. Cuyahoga No. 101489, 2015-Ohio-1294. In *Bell,* even though the owner of the house died, the court did not find that the home was abandoned. The house still had a residential purpose even though it was unoccupied because relatives were maintaining the house when the burglary occurred. The house contained furniture, appliances, and utilities. Therefore, the court found that it was an occupied structure under R.C. 2909.01(C)(1).

{¶28} Although Lemaster's wife had died and he has opted to live in another home, he has maintained the house at 7149 County Road 550 as a

dwelling.  Similar to *Bell*, Lemaster maintained the utilities at the house, made repairs, and kept it furnished.  Therefore, there is sufficient evidence to support that Lemaster's house was an occupied dwelling under R.C. 2909.01(C) at the time of the burglary herein.

### A. Law

#### 1. Standard of Review

**{¶29}** "When reviewing a case to determine if the record contains sufficient evidence to support a criminal conviction, we must ' "examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." ' " *State v. Knowlton*, 2012-Ohio-2350, 971 N.E.2d 395, ¶ 10 (4th Dist.), quoting *State v. Smith,* 4th Dist. Pickaway No. 06CA7, 2007-Ohio-502, ¶ 33, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.  Thus, " ' "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." ' " *Id.*, quoting *Smith*, quoting *Jenks*.

#### 2. Burglary

**{¶30}** Third-degree-felony burglary requires the state to prove that "by force, stealth, or deception," the defendant "trespasses in an *occupied structure* with purpose to commit in the structure or separately secured or separately occupied portion of the structure any criminal offense."  (Emphasis added.)  R.C.

2911.12(A)(3) and (D).  For purposes of a burglary " 'occupied structure' has the same meaning as in section 2909.01 of the Revised Code."  R.C. 2911.12(C).

### 3. R.C. 2909.01(C)

{¶31} R.C. 2909.01(C) provides:

> (C) "Occupied structure" means any house, building, outbuilding, watercraft, aircraft, railroad car, truck, trailer, tent, or other structure, vehicle, or shelter, or any portion thereof, to which any of the following applies:
> (1) It is maintained as a permanent or temporary dwelling, even though it is temporarily unoccupied and whether or not any person is actually present.
> (2) At the time, it is occupied as the permanent or temporary habitation of any person, whether or not any person is actually present.
> (3) At the time, it is specially adapted for the overnight accommodation of any person, whether or not any person is actually present.
> (4) At the time, any person is present or likely to be present in it.

### B. Analysis

{¶32} In the context of a burglary offense, "[a]t common law, the house had to be 'occupied' as a dwelling, although a temporary absence with the intention of returning would not render it unoccupied." *State v. Green*, 18 Ohio App.3d 69, 71, 480 N.E.2d 1128 (10th Dist.1984).  "However, a house that was permanently abandoned or its use changed to something other than residential, would cease to be regarded as a dwelling.  The offense was said to be one against the security of habitation, and not an offense against property."  *Id*., citing Clark and Marshall, Law of Crimes, Sections 406-407 (1952).

{¶33} However, *Green* went on to find that in promulgating R.C. 2909.01(A), now R.C. 2909.01(C),

> [i]t is obvious that the General Assembly, *in adopting the definition of "occupied structure" found in R.C. 2909.01, intended to broaden the concept of the offense of burglary* from one of an offense against the security of habitation, *to one concerned with the serious risk of harm created by the actual or likely presence of a person in a structure of any nature.* In that context, *it is noteworthy that the General Assembly utilized the word "maintained" * * * as opposed to "occupied*[.]" * * * We believe that *the distinction between "maintained" and "occupied" is significant, in the sense that the former alludes more to the character or type of use for which the dwelling is intended to be subjected,* whereas the latter is more closely related to the actual use to which the structure is presently being subjected.  (Emphasis added.)

*Id.* at 71-72.

**{¶34}** We find that the state presented sufficient evidence that the property was occupied under R.C. 2909.01(C)(1) and (4).

### 1. R.C. 2909.01(C)(1)

**{¶35}** Consistent with *Green*'s recognition in this regard, the Eighth District Court of Appeals interpreting R.C. 2909.01(C)(1) has held that "the relevant inquiry in determining whether a structure is occupied concerns the residential purpose of the dwelling, rather than the presence or absence of an occupant." *State v. Calderwood*, 194 Ohio App.3d 438, 956 N.E.2d 892, ¶ 15 (8th Dist. 2011), citing *Green*, 18 Ohio App.3d 69, 480 N.E.2d 1128 (10th Dist.1984) (home left vacant after the owners moved to another residence was still an occupied structure because it was being maintained as a dwelling); *State v. Williams*, 8th Dist. Cuyahoga No. 92668, 2009-Ohio-6826 (the fact that no one lived in the house for four months is irrelevant in determining whether it was an occupied structure); *State v. Charley*, 8th Dist. Cuyahoga No. 82944, 2004-Ohio-3463

(structure is still occupied despite the fact that the owner was in a nursing home and the daughter was having the house restored); *State v. Sharp*, 8th Dist. Cuyahoga No. 86827, 2006-Ohio-3158 (structure's status as an occupied structure depends on the residential purpose of the dwelling rather than the presence or absence of an occupant); *State v. Tornstrom*, Cuyahoga App. No. 72898, 1998 WL 811314 (Nov. 19, 1998) (a home uninhabitable while undergoing major renovations was found to be an occupied structure); *Compare State v. Anderson,* 2012-Ohio-3663, 975 N.E.2d 556, ¶ 14 (9th Dist.) (A house condemned by a municipality as uninhabitable with no evidence of any future repairs is not maintained as a dwelling for purposes of R.C. 2909.01(C)(1)).

**{¶36}** We find the case of *State v. Bell* particularly instructive in the instant case.  8th Dist. Cuyahoga No. 101489, 2015-Ohio-1294.  In *Bell*, the defendant, who was convicted of burglary, argued that the house was not occupied at the time of the offense.  The court of appeals found that even though the owner of the house had died, "her house was not abandoned."  *Id.* at ¶ 23.  Quoting *Calderwood*, 194 Ohio App.3d 438 at ¶ 15, the court in *Bell* found that

> [t]he evidence proved that the house maintained its residential purpose even though it was vacant.  "[The decedent's daughter] and her husband maintained the property and when the incident occurred, the house was fully equipped with utilities, appliances, a furnace, and furniture. Therefore, the house was an 'occupied structure' within the meaning of R.C. 2909.01(C)(1)."

*Id.*

**{¶37}** Similar to the house in *Bell*, Lemaster's house at 7149 County Road 550 maintained its "residential purpose" because Lemaster's mail was delivered there, it contained furniture and Lemaster's belongings, the utilities were on, and

Lemaster made repairs to the house (e.g., he repaired the sump pump).

Therefore, after viewing the evidence in a light most favorable to the prosecution,

we find that the jury could have concluded that Lemaster's house was an

occupied structure under R.C. 2909.01(C)(1).

{¶38} Contrary to Ratliff's argument, we find that *Whitake*r is

distinguishable from the instant case.  Instrumental in *Whitaker*'s holding that the

house therein was not maintained as a permanent residence under R.C.

2909.01(C)(1) was due, at least in part, to the fact that the house was "gutted"

during a renovation making it uninhabitable during that period of time.  *Whitaker*,

169 Ohio St.3d 647, at ¶ 63.  No similar activity was occurring at Lemaster's

house that could have rendered the house uninhabitable during the burglary.

## 2. R.C. 2909.01(C)(4)

{¶39} R.C. 2909.01(C) also defines an "occupied structure" as including a

"house" where "[a]t any time, any person is present or *likely to be present* in it."

R.C. 2909.01(C)(4).  " '[A] person is likely to be present [in a house] when a

consideration of *all* the circumstances would seem to justify a logical expectation

that a person *could* be present.' " (Brackets and emphasis sic.) *Bell*, 8th Dist.

Cuyahoga No. 101489, 2015-Ohio-1294, quoting *State v. Cantin,* 132 Ohio

App.3d 808, 813, 726 N.E.2d 565 (8th Dist.1999), citing *State v. Green,* 18 Ohio

App.3d 69, 480 N.E.2d 1128 (10th Dist.1984).  Consequently, "if the evidence

demonstrates that the caretaker in possession of the former occupant's key has

the right of access to the home regularly, then there will be sufficient evidence

that a person is 'likely to be present' for purposes" of occupancy.  *Id*., quoting

*State v. Cochran,* 8th Dist. Cuyahoga No. 50057, 1986 WL 1302 (Jan. 30, 1986);

*State v. Robinson,* 8th Dist. Cuyahoga Nos. 49501 and 49518, 1985 WL 8499

(Oct. 24, 1985) (a person is likely to be present when the homeowner was away,

but had given keys to a neighbor who checked on the house periodically).

**{¶40}** As the owner of the house at 7149 County Road 550, Lemaster

obviously could access his house at any time.  He testified that he typically

stopped *at least* once a day.  When asked if he had stopped by the day of the

burglary, he said he had not because he was at work.  However, when asked

what his work hours were, Lemaster responded "usually whatever I want to

work."  Viewing the evidence in a light most favorable to the prosecution, we find

that the jury could have determined that Lemaster's house was "occupied" under

R.C. 2909.01(C)(4) for purposes of her burglary conviction because he was

"likely to be present" therein.

**{¶41}** Because Lemaster maintained the residential purpose of his house,

and was "likely to be present" in his house, we find that there was sufficient

evidence for the jury to find that his house was an "occupied structure" under

R.C. 2909.01(C).  Consequently, we find that there is sufficient evidence that

Lemaster's house was "occupied" to support Ratliff's burglary conviction.

Accordingly, we overrule Ratliff's first assignment of error.

Second Assignment of Error

**{¶42}** In her second assignment of error, Ratliff alleges that her conviction

for burglary is against the manifest weight of the evidence because the state did

not submit substantial evidence that she committed burglary. She claims that the

testimony by the deputies and Morris established that Brandon Stodgel committed the burglary of Lemaster's home, not her. Ratliff maintains that Morris's testimony amounted to guilt by association because he "testified that because [Ratliff] was with Mr. Stodgel, she must have been an outlaw." Ratliff claims that Stodgel was the driver of the pickup truck, while she was only a passenger. Merely being at the scene is not enough to support Ratliff's conviction. Finally, she also maintains that the police and Lemaster testified that they found only one trash bag of items in the pickup truck, which contradicts Morris's testimony that he saw the suspects carrying two trash bags of items.

{¶43} Ratliff also claims that her conviction is against the manifest weight of the evidence because Lemaster's house was not an occupied structure. The only evidence that he presented in support that the house was occupied was that Lemaster picked up his mail, checked the sump pump, and maintained the utilities.

{¶44} In response, the state asserts that Ratliff's conviction for burglary is supported by the manifest weight of the evidence because of her conduct at the scene and circumstantial evidence. The state maintains that Morris observed a male and female carrying "stuff" outside Lemaster's house, and he identified the female as the defendant, Caitlin Ratliff. And there was no evidence that Morris would be motivated to lie in identifying Ratliff as the female suspect. Conversely, the jury did not believe Ratliff's testimony that she was not involved in the burglary, which it may do as the fact-finder. Finally, some of the items stolen would be of interest to a female, e.g. jewelry and women's jeans.

**{¶45}** The state also argues that the manifest weight of the evidence supports that Lemaster's house was occupied for purposes of the burglary because he maintained his residence as a dwelling so he could stay there. "[Lemaster] keeps the utilities on; he get (sic) his mail there, he goes there every day to check on things, he maintains the sump pump to make sure it doesn't flood the basement." The state also notes that all the witnesses referred to Lemaster's dwelling as his "house."

**{¶46}** Thus, the state maintains that Ratliff's burglary conviction is supported by the manifest weight of the evidence.

## A. Law

**{¶47}** "Even when sufficient evidence supports a verdict, we may conclude that the verdict is against the manifest weight of the evidence, because the test under the manifest weight standard is much broader than that for sufficiency of the evidence." *State v. Stevens*, 4th Dist. Highland No. 09CA3, 2009-Ohio-6143, ¶ 18, citing *State v. Banks*, 78 Ohio App.3d 206, 214, 604 N.E.2d 219 (10th Dist. 1992).

**{¶48}** "In determining whether a criminal conviction is against the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, [and] consider the credibility of witnesses[.]" *State v. Evans*, 4th Dist. Ross No. 22CA31, 2023-Ohio-1879, ¶ 26, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). However, we "generally must defer to the fact-finder's credibility determinations." *State v. McNichols*, 2020-Ohio-2705, 154 N.E.3d 125, ¶ 10 (4th Dist.), citing *Eastley v.*

*Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 21.  We must then "determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that reversal of the conviction is necessary."  *Evans* at ¶ 26  "To satisfy this test, the state must introduce substantial evidence on all the elements of an offense, so that the jury can find guilt beyond a reasonable doubt."  *Id.*, citing *State v. Eskridge*, 38 Ohio St.3d 56, 526 N.E.2d 304, syllabus (1988).

### B. Analysis

{¶49} We find that the state presented substantial evidence that Ratliff committed the burglary herein.  Morris testified that he saw two suspects at Lemaster's house, one male and one female on the day of the burglary "carrying stuff."  The pickup truck which was used by the suspects for transportation contained property stolen from Lemaster's house.  After Morris confronted the suspects and the suspects' pickup truck got stuck in the mud, the suspects fled into the woods behind Lemaster's house.

{¶50} The evidence further established that shortly after the burglary two persons emerged from the woods about 1/8 of a mile from Lemaster's house, crossed a field, and entered an orange vehicle.  Believing that those persons might be the suspects, law enforcement officers stopped an orange Honda Element.  Ratliff was one of the passengers.  She was arrested and described as "disheveled" and "covered in mud," which is consistent with someone who would have had to navigate the woods and a field after fleeing from the rear of Lemaster's house on a day when the conditions were "wet" and "muddy."  She

was also wearing a coat that had a watch in its pocket that Lemaster identified as having come from his house and belonged to his deceased wife. Finally, Morris identified Ratliff, whom he had known for 15 years, as the female suspect who he saw at Lemaster's house earlier that day, and there is no evidence in the record that questions his credibility.

{¶51} We also find that the state submitted substantial evidence that Lemaster's house was "occupied" for purposes of the burglary. The state presented evidence that Lemaster's house maintained its "residential purpose" under R.C. 2909.01(C)(1) because he came to the house at least once a day, received his mail at the house, the house contained furniture and his various belongings, the utilities were on, and Lemaster undertook repairs to the house, e.g., the sump pump. The state also presented evidence that Lemaster was "likely to be present" in his house under R.C. 2909.01(C)(4) because, as its owner, he had a key so he could access the house at any time, and typically visited the house at least once a day.

{¶52} After reviewing the entire record, weighing the evidence, considering all reasonable inferences and credibility of witnesses, we find that the state presented substantial evidence that Ratliff committed burglary so the jury did not lose its way in finding Ratliff guilty. Therefore, we overrule Ratliff's second assignment of error finding that Ratliff's conviction is supported by the manifest weight of the evidence.

CONCLUSION

**{¶53}** Having overruled both of Ratliff's assignments of error, we affirm the

trial court's judgment entry of Ratliff's conviction.

**JUDGMENT AFFIRMED.**

## JUDGMENT ENTRY

It is ordered that the JUDGMENT IS AFFIRMED and appellant shall pay the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Ross County Common Pleas Court to carry this judgment into execution.

Any stay previously granted by this Court is hereby terminated as of the date of this entry.

IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed 60 days upon the bail previously posted.  The purpose of a continued stay is to allow Appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court.  If a stay is continued by this entry, it will terminate at the earlier of the expiration of the 60-day period, or the failure of the Appellant to file a notice of appeal with the Supreme Court of Ohio in the 45-day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio.  Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of 60 days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Smith, P.J. and Hess, J.:  Concur in Judgment and Opinion.

For the Court,


BY: _____
Kristy S. Wilkin, Judge


**NOTICE TO COUNSEL**
**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**